**PUBLIC OFFICE CORPORATION, et al., Appellants,**

v.

**CLINTON FOR PRESIDENT COMMITTEE, et al., Appellees.**

**No. 99–7002.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 5, 1999.

Decided Oct. 29, 1999.

Rehearing Denied Dec. 8, 1999.

Michael E. Geltner argued the cause and filed the briefs for appellants.

John C. Keeney, Jr., argued the cause for appellees. With him on the brief was Kelleen McGinnis Scott.

Before: EDWARDS, Chief Judge, WALD and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellants, the Public Office Corporation ("POC") and its directors, provided computer systems services to appellees, the Clinton for President Committee and its auxiliaries ("Committee"). As part of a routine audit mandated by federal election campaign law, auditors for the Federal Election Commission ("FEC" or "the Commission") issued an interim report in which they identified possible discrepancies in the Committee's accounts. In response to this audit report, the Committee attributed

these disparities in part to the actions of an unnamed computer vendor. Alleging that the Committee had made libelous statements about them in its response to the report, appellants filed suit. Appellees moved to dismiss the libel suit under 2 U.S.C. § 437d(c), which provides statutory immunity against civil liability for disclosing information "at the request of the Commission." 2 U.S.C. § 437d(c). This is an appeal from the district court's order dismissing the suit. Appellants argue that the allegedly libelous statements made by the Committee were not immune because they were not made "at the request of the Commission." *Id.* We hold in conformity with the district court that the Commission's audit report did constitute a request for information. Thus, the Committee's statements in response to that report were immunized under § 437d(c).

## I. BACKGROUND

Appellants, POC and its directors, William and Patricia Anderson, provided data processing services and assistance in complying with federal election laws to political campaigns. Appellees, the Clinton for President Committee and the Clinton/Gore '92 General Election Compliance Fund, retained POC to provide computer systems support during the primary and general election campaigns. As is customary under federal election campaign law, the FEC conducted an audit of the Committee's accounts; in their report the auditors found discrepancies. In response to an interim report issued by the FEC's auditors, the Committee attributed some of these disparities to errors made by one of its vendors. Alleging that their profes-

sional reputation had been damaged by three statements, POC and its directors sued to recover damages for libel against the Committee and its attorney.[1] This appeal arises from an order issued by the district court granting the appellees' motion to dismiss appellants' libel suit under 2 U.S.C. § 437d(c), which provides statutory immunity against civil liability for disclosing information "at the request of the Commission." 2 U.S.C. § 437d(c).

The Committee received federal election campaign funds under the Presidential Primary Matching Payment Account Act ("PPMPAA"), 26 U.S.C. § 9031 *et seq.* As a condition of receiving such funds, a campaign committee is required to "agree to an audit and examination by the Commission." 26 U.S.C. § 9033(a)(3). The PPMPAA and implementing regulations set out a mandatory procedural framework for conducting an audit. *See* 26 U.S.C. § 9038(a); 11 C.F.R. § 9038.1. The auditing process involves four steps.[2] First, the Committee must submit documentation to the FEC's auditors to be utilized in conducting the audit. Second, the audit staff releases an interim audit report detailing its preliminary findings and recommendations. *See* 11 C.F.R. § 9038.1(c)(1). These recommendations may include tentative repayment amounts, if the Committee is found to have received federal funds in excess of actual eligibility. Third, the Committee "will have an opportunity to submit, in writing ... legal and factual materials disputing or commenting on the contents of the interim report." 11 C.F.R. § 9038.1(c)(2). Fourth, after consideration of the Committee's responses, the Commission publicly releases its final audit re-

---

1. The Clinton/Gore '92 General Election Compliance Fund was formed by the Committee to ensure compliance with legal and accounting functions for the 1992 Clinton/Gore election campaign. For all purposes relevant to this case, the General Election Compliance Fund operated in conjunction with the Committee. Similarly, Carolyn ("Lyn") Utrecht was an attorney employed by the Committee with responsibility for FEC audit matters. Thus, the term "Committee" when used in

this opinion is inclusive of the General Election Compliance Fund and Utrecht.

2. This description of the auditing process is based on the 1994 version of section 9038.1. In 1995, section 9038.1 was revised to replace the interim audit report with an exit conference memorandum. All parties agree, however, that the 1994 version is applicable to the instant case.

port, which may differ from its interim audit report. The Commission may publish a committee's responses in its own final report.

In this case, the interim audit report discussed several alleged discrepancies in the Committee's accounts, including excessive redesignations. Contributions made to a primary campaign may, in certain limited circumstances, be transferred to the general election campaign by written redesignation. *See* 11 C.F.R. §§ 103.3, 110.1, 110.2, and 9003.3. The audit staff found that in many instances, the "redesignations pursued by the Committee were not permissible." Joint Appendix ("J.A.") at 250.

Moreover, according to the report, the excessive redesignation effort caused the Committee to receive matching funds in excess of entitlement. By redesignating funds from the primary election campaign to the general election campaign, it appeared that the Committee did not have sufficient private funds in its primary campaign to meet its financial obligations. J.A. at 248–50. Therefore, the primary campaign remained eligible for matching funds. However, the Commission staff contended that most of the funds were improperly redesignated and should have been considered available to the primary campaign to discharge its financial obligations. Thus, it concluded that "the Candidate had received matching funds in excess of his entitlement." J.A. at 249. Given this finding, the report recommended that "the Committee provide evidence to demonstrate that it did not receive matching funds in excess of entitlement." J.A. at 251.

The issue in this case is whether three statements about POC that the Committee made in its response to the interim audit report fall within the statutory grant of immunity for information given "at the request of the Commission." 2 U.S.C. § 437d(c). The first alleged defamatory statement involves the Committee's response to the report's finding that the Committee had received excessive public funds, primarily due to the volume of improper redesignations. Since the propriety of this finding depended on whether the Committee had improperly conducted redesignations, the Committee sought to explain its redesignation efforts. Agreeing that many redesignations were "superfluous," J.A. at 101, the Committee referred to an unnamed vendor whose "contract ... included an incentive for the vendor to treat contributions as though additional documentation or affidavit was necessary." J.A. at 100. This statement was later published by the FEC in its final audit report. Contending that this statement was libelous, POC asserted that the clear implication was that it had conducted improper redesignations to augment its profits. POC further argued that although the vendor was not named, it could easily be identified since a vendor list was published with the final report.

In the second and third "defamatory" statements, appellants also alleged that the Committee essentially tried to shift blame for its accounting discrepancies to POC. The second statement concerned the Committee's assertion that discrepancies in its account balances were "essentially due to errors by one of the Committee's computer vendors who failed to reconcile her records." J.A. at 63. POC asserted that while she was not named, the "her" was an obvious reference to its director, Patricia Anderson, who performed these functions and was widely known to have done so. In the third statement, the Committee explained recordkeeping errors by stating that "[d]uring this period, the Committee experienced significant difficulties with the vendor preparing the Primary Committee's reports." *Id.*

In response to the lawsuit, appellees filed a motion arguing that 2 U.S.C. § 437d(c), the provision that provides statutory immunity for information disclosed at the FEC's request, mandated dismissal. The district court granted the defendant's motion to dismiss, finding that the state-

ments made by the Committee to the FEC were in fact "privileged against civil liability under § 437d(c)." Memorandum Opinion at 13 (reprinted in J.A. at 18). The court determined that § 437d(c) set forth a "two-fold test" for immunity: "the statements must be (1) at the request (2) of the Commission." Memorandum Opinion at 7 (reprinted in J.A. at 12). The court determined that the report "contain[ed] unequivocal requests for information." Memorandum Opinion at 9 (reprinted in J.A. at 14). The court also held that the second prong of § 437d(c) was satisfied, rejecting the argument that the audit staff was a separate entity from the Commission. However, the court declined to accept appellees' ambitious contention that all audit submissions necessarily constitute responses to Commission requests that fall within § 437d(c)'s scope.

On appeal, appellants assert that the statements do not meet § 437d(c)'s bifurcated test. Noting that § 437d(c)'s grant of immunity is contingent on the issuance of a "request," appellants first contend that the statements in the Commission's interim report were not "requests." Appellants also assert that because the report was not issued by the Commission, but by its audit staff, which is an entity distinct from the Commission, the statements fail to meet the second prong of § 437d(c)'s test.

## II. DISCUSSION

The viability of appellants' libel suit turns on whether the allegedly defamatory statements fall within the immunity provision's scope. *See* 2 U.S.C. § 437d(c). Recalling the Supreme Court's holding that "in any case of statutory construction, our analysis begins with the language of the statute," we turn to the text of § 437d(c). *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 119 S.Ct. 755, 760, 142 L.Ed.2d 881 (1999) (internal quotation marks omitted).

That text is straightforward. Section 437d(c) provides that "n[o] person shall be subject to civil liability to any person (oth-er than the Commission or the United States) for disclosing information at the request of the [Federal Election] Commission." 2 U.S.C. § 437d(c). Thus, the contested statements must be made in response to a request by the Commission.

### A. *"At the Request" Of*

■ We first determine whether the statements in this case were made "at the request" of the FEC and in that pursuit, we begin with a careful reading of the FEC's interim audit report. If we find there are such requests we will decide whether the Committee's statements were responsive to them. The first disputed statement is as follows:

> The auditors focused here on whether these contributions were properly redesignated to the Compliance Fund, but, in fact, in order to have been considered primary contributions in the first instance, the regulations required that they be **designated in writing** for the primary. Very few of them were so designated. The Committee's vendor who processed these contributions treated them as "redesignations" even though they were not. That vendor's contract had been negotiated early in the campaign by the Committee's original counsel and included an incentive for the vendor to treat contributions as though additional documentation or affidavit was necessary. Under the contract, the vendor received an additional amount per contribution for which additional documentation or an affidavit was obtained. The Committee staff did not see these contributions until well after the election, but relied solely on the vendor's expertise to handle the contributions appropriately.

J.A. at 100 (emphasis in original).

That statement directly responds to that portion of the interim report in which the audit staff contended that the Committee was conducting impermissible redesignations. In a section entitled "Receipt of

Matching Funds in Excess of Entitlement," the interim audit report finds that the Committee received funds in excess of its actual eligibility, primarily due to the volume of improper redesignations. J.A. at 247–51.[3] In its conclusion to that section, the audit staff issued the following recommendation:

The Audit staff recommends that within 30 calendar days of service of this report, the Committee *provide evidence to demonstrate* that it did not receive matching funds in excess of entitlement. Absent such a demonstration, the Audit staff will recommend ... that the Committee repay $3,674,353 to the U.S. Treasury.

J.A. at 251 ("Recommendation Ten") (emphasis added).

Appellants' contention that this recommendation is not a request is hardly credible. Surely a recommendation that the committee "provide evidence" to demonstrate that it was not violating the law is a genuine request for more information in ordinary parlance and especially in the context of a government audit.

Moreover, even if this language were not sufficiently clear, the transmittal letter accompanying the audit report removes all doubts that Recommendation Ten was in fact a "request." Prominently featured in the letter accompanying the report is the following instruction:

This report is to formally advise you of the findings and recommendations of the Audit staff resulting from the audit of the Clinton for President Committee. You are *requested to comply* with the recommendations by May 4, 1994.

J.A. at 205 (emphasis added). Recommendation Ten, read in conjunction with the transmittal letter, clearly confirms that the report did in fact contain a specific request to which the Committee was responding in its first disputed statement.[4]

Appellants accurately point out that the other two disputed statements were responsive to sections of the report in which the audit staff recommended that no further action be taken. *See* J.A. at 211, 212. From that fact, appellants argue that there is no need for any response and no reason to construe the audit report as calling for one. The second statement in which the Committee attributed misstatements in its accounting to errors by an unnamed computer vendor, was made in response to a section of the report entitled "Misstatement of Financial Activity." J.A. at 210–11. This section delineated discrepancies in the Committee's accounts and charged the Committee with failure to maintain supporting documentation that might have explained away these discrepancies. While this section of the audit report does not so clearly cry out for a response as Recommendation Ten, it confirms a clear implication of past wrongdoing by the Committee.

For example, the audit report notes that although the Committee claimed to have identified all disbursements in its pre-audit inventory, further research by the auditors revealed "significantly different" disbursements. J.A. at 210–11. Moreover, the report states that although the Committee later corrected these misstatements, it failed to maintain the supporting documentation that would have allowed the audit

---

3. The auditors found that:

[d]uring the period when the redesignations were being sought for the contributions deposited into the Suspense Account, the Committee continued to request and receive matching fund payments based on ... statements that apparently did not recognize contributions deposited into the suspense account.... Therefore, as of September 2, 1992, the Candidate had received matching funds in excess of his entitlement.

J.A. at 248–49.

4. Appellants also argue that even if Recommendation Ten does constitute a request, the Committee's response is not material to the request. We may easily dismiss this contention. To the extent that the audit staff asserted that the excessive payments were due to unnecessary redesignations, appellees quite reasonably chose to address the necessity of such redesignations.

staff to "identify the reasons for the misstatements." J.A. at 211. The Committee could quite reasonably construe such a suggestion of accounting discrepancies and shoddy recordkeeping as a request for explanatory information, in the absence of which the auditors' tentative conclusion of wrongdoing would remain on the record, even if no remedies were sought. The Committee's issuance of an explanatory statement in an effort to account for the discrepancies falls within the scope of a "request."

The third statement in which the Committee referred to difficulties with an unnamed vendor who prepared its reports, was made in response to a section entitled "Itemization of Receipts." J.A. at 211–12. Although this section of the audit report was admittedly more neutral so far as any implication of wrongdoing was concerned than the section just described, it essentially highlighted the Committee's failure to itemize its records. For example, the report noted that a significant percentage of the contributions which required itemization were not correctly itemized. J.A. at 211. Given the inevitably tense atmosphere of an audit, especially one of a Committee which does ongoing business with the agency and whose members can be expected to be repeat supplicants for federal money, the auditee will understandably feel it imperative to provide answers to questions raised by the audit report. Additionally, it bears noting that the report was an interim one. Even the recommendation for no further action would not become final until the Commission acted upon it—hence the felt need of the subject to provide any exculpatory information.

Importantly, in this case, there can be little question that the Committee's statements were relevant and responsive to the Commission's concerns. There is then no need to even consider appellees' contention that any information submitted within the context of an audit is immunized irrespective of whether it is germane to the Commission's report. The district court reasonably rejected appellees' assertion of an immunity so broad that it would include even gratuitous information that was not responsive to the concerns in the report.

In sum, we hold that the Commission's report did indeed constitute a request for information in the three areas discussed and thus, the Committee's statements in response to these requests are immunized under § 437d(c). Having found that the statements meet § 437d(c)'s first request prong, we discuss briefly whether these requests were issued at the request "of the Commission."

## B. "Of the Commission"

 Appellants allege that even if the statements were responsive to requests contained in the audit report, this report was not issued by the Commission itself but by its audit staff, which under the statute constitutes a distinct entity.[5] Thus, appellants assert that even if the report did contain requests, the audit staff had no power to confer immunity under § 437d(c), since any immunity-conferring requests must be issued by the Commission itself. Appellants' strained distinction between the FEC and the staff working under its direction simply does not cut the mustard. We agree with the district court that "it was the Commission, acting pursu-

5. Appellants assert that there is a clear distinction between the Commission and its staff on the face of the statute. They emphasize that the statutory provision establishing the FEC states that it consists of "the Secretary of the Senate and the Clerk of the House of Representatives or their designees, ex officio and without the right to vote, and six members appointed by the President, by and with the advice and consent of the Senate." 2 U.S.C. § 437c(a)(1). On appellants' reading, any person who is not included within this definition may not act on behalf of the Commission, so far as § 437d(c) is concerned. The district court dismissed appellants' argument noting that "this definition describes the membership of the Committee and not its duties. By contrast the focus of this case is the functions of the Commission." Memorandum Opinion at 10 (reprinted in J.A. at 15).

ant to its statutory authority, that conducted the interim audit." Memorandum Opinion at 11 (reprinted in J.A. at 16).[6]

### III. CONCLUSION

For the foregoing reasons, we hold that the Committee's statements are immunized under § 437d(c). The decision of the district court is

*Affirmed.*

**6.** *See, e.g.,* 2 U.S.C. § 438(b) (*"The Commission* may conduct audits and field investigations ... [p]rior to conducting any audit ... the *Commission* shall perform an internal review of reports filed by selected committees."); 26 U.S.C. § 9038(a) (*"After each matching payment period, the Commission* shall conduct a thorough examination and audit."); 26 U.S.C. § 9040(b) (*"The Commission* is authorized ... to institute actions ... to seek recovery of any amounts determined to be payable to the Secretary as a result of an examination and audit made pursuant to section 9038."); 11 C.F.R. § 9038.1(c)(1) (1994) (*"The Commission* will issue an interim audit report to the candidate and his or her authorized committee."); 11 C.F.R. § 9038.1(c)(3) (*"The Commission* will consider any written legal and factual materials submitted by the candidate or his or her authorized committee.") (emphasis added in all citations).