United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 5, 1999 Decided October 29, 1999 

 No. 99-7002

 Public Office Corporation, et al., 
 Appellants

 v.

 Clinton for President Committee, et al., 
 Appellees

 ---------

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 95cv01264)

 ---------

 Michael E. Geltner argued the cause and filed the briefs 
for appellants.

 John C. Keeney, Jr., argued the cause for appellees. With 
him on the brief was Kelleen McGinnis Scott.

 Before: Edwards, Chief Judge, Wald and Williams, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Wald.

 Wald, Circuit Judge: Appellants, the Public Office Corpo-
ration ("POC") and its directors, provided computer systems 

services to appellees, the Clinton for President Committee 
and its auxiliaries ("Committee"). As part of a routine audit 
mandated by federal election campaign law, auditors for the 
Federal Election Commission ("FEC" or "the Commission") 
issued an interim report in which they identified possible 
discrepancies in the Committee's accounts. In response to 
this audit report, the Committee attributed these disparities 
in part to the actions of an unnamed computer vendor. 
Alleging that the Committee had made libelous statements 
about them in its response to the report, appellants filed suit. 
Appellees moved to dismiss the libel suit under 2 U.S.C. 
s 437d(c), which provides statutory immunity against civil 
liability for disclosing information "at the request of the 
Commission." 2 U.S.C. s 437d(c). This is an appeal from 
the district court's order dismissing the suit. Appellants 
argue that the allegedly libelous statements made by the 
Committee were not immune because they were not made "at 
the request of the Commission." Id. We hold in conformity 
with the district court that the Commission's audit report did 
constitute a request for information. Thus, the Committee's 
statements in response to that report were immunized under 
s 437d(c).

 I. Background

 Appellants, POC and its directors, William and Patricia 
Anderson, provided data processing services and assistance in 
complying with federal election laws to political campaigns. 
Appellees, the Clinton for President Committee and the Clin-
ton/Gore '92 General Election Compliance Fund, retained 
POC to provide computer systems support during the pri-
mary and general election campaigns. As is customary under 
federal election campaign law, the FEC conducted an audit of 
the Committee's accounts; in their report the auditors found 
discrepancies. In response to an interim report issued by the 
FEC's auditors, the Committee attributed some of these 
disparities to errors made by one of its vendors. Alleging 
that their professional reputation had been damaged by three 
statements, POC and its directors sued to recover damages 

for libel against the Committee and its attorney.1 This 
appeal arises from an order issued by the district court 
granting the appellees' motion to dismiss appellants' libel suit 
under 2 U.S.C. s 437d(c), which provides statutory immunity 
against civil liability for disclosing information "at the request 
of the Commission." 2 U.S.C. s 437d(c).

 The Committee received federal election campaign funds 
under the Presidential Primary Matching Payment Account 
Act ("PPMPAA"), 26 U.S.C. s 9031 et seq. As a condition of 
receiving such funds, a campaign committee is required to 
"agree to an audit and examination by the Commission." 26 
U.S.C. s 9033(a)(3). The PPMPAA and implementing regu-
lations set out a mandatory procedural framework for con-
ducting an audit. See 2 U.S.C. s 9038(a); 11 C.F.R. s 9038.1. 
The auditing process involves four steps.2 First, the Commit-
tee must submit documentation to the FEC's auditors to be 
utilized in conducting the audit. Second, the audit staff 
releases an interim audit report detailing its preliminary 
findings and recommendations. See 11 C.F.R. s 9038.1(c)(1). 
These recommendations may include tentative repayment 
amounts, if the Committee is found to have received federal 
funds in excess of actual eligibility. Third, the Committee 
"will have an opportunity to submit, in writing ... legal and 
factual materials disputing or commenting on the contents of 
the interim report." 11 C.F.R. s 9038.1(c)(2). Fourth, after 
consideration of the Committee's responses, the Commission 

__________
 1 The Clinton/Gore '92 General Election Compliance Fund was 
formed by the Committee to ensure compliance with legal and 
accounting functions for the 1992 Clinton/Gore election campaign. 
For all purposes relevant to this case, the General Election Compli-
ance Fund operated in conjunction with the Committee. Similarly, 
Carolyn ("Lyn") Utrecht was an attorney employed by the Commit-
tee with responsibility for FEC audit matters. Thus, the term 
"Committee" when used in this opinion is inclusive of the General 
Election Compliance Fund and Utrecht.

 2 This description of the auditing process is based on the 1994 
version of section 9038.1. In 1995, section 9038.1 was revised to 
replace the interim audit report with an exit conference memoran-
dum. All parties agree, however, that the 1994 version is applicable 
to the instant case.

publicly releases its final audit report, which may differ from 
its interim audit report. The Commission may publish a 
committee's responses in its own final report.

 In this case, the interim audit report discussed several 
alleged discrepancies in the Committee's accounts, including 
excessive redesignations. Contributions made to a primary 
campaign may, in certain limited circumstances, be trans-
ferred to the general election campaign by written redesig-
nation. See 11 C.F.R. ss 103.3, 110.1, 110.2, and 9003.3. The 
audit staff found that in many instances, the "redesignations 
pursued by the Committee were not permissible." Joint 
Appendix ("J.A.") at 250.

 Moreover, according to the report, the excessive redesig-
nation effort caused the Committee to receive matching funds 
in excess of entitlement. By redesignating funds from the 
primary election campaign to the general election campaign, 
it appeared that the Committee did not have sufficient private 
funds in its primary campaign to meet its financial obli-
gations. J.A. at 248-50. Therefore, the primary campaign 
remained eligible for matching funds. However, the Commis-
sion staff contended that most of the funds were improperly 
redesignated and should have been considered available to 
the primary campaign to discharge its financial obligations. 
Thus, it concluded that "the Candidate had received matching 
funds in excess of his entitlement." J.A. at 249. Given this 
finding, the report recommended that "the Committee pro-
vide evidence to demonstrate that it did not receive matching 
funds in excess of entitlement." J.A. at 251.

 The issue in this case is whether three statements about 
POC that the Committee made in its response to the interim 
audit report fall within the statutory grant of immunity for 
information given "at the request of the Commission." 2 
U.S.C. s 437d(c). The first alleged defamatory statement 
involves the Committee's response to the report's finding that 
the Committee had received excessive public funds, primarily 
due to the volume of improper redesignations. Since the 
propriety of this finding depended on whether the Committee 
had improperly conducted redesignations, the Committee 
sought to explain its redesignation efforts. Agreeing that 

many redesignations were "superfluous," J.A. at 101, the 
Committee referred to an unnamed vendor whose "contract 
... included an incentive for the vendor to treat contributions 
as though additional documentation or affidavit was neces-
sary." J.A. at 100. This statement was later published by 
the FEC in its final audit report. Contending that this 
statement was libelous, POC asserted that the clear implica-
tion was that it had conducted improper redesignations to 
augment its profits. POC further argued that although the 
vendor was not named, it could easily be identified since a 
vendor list was published with the final report.

 In the second and third "defamatory" statements, appel-
lants also alleged that the Committee essentially tried to shift 
blame for its accounting discrepancies to POC. The second 
statement concerned the Committee's assertion that discrep-
ancies in its account balances were "essentially due to errors 
by one of the Committee's computer vendors who failed to 
reconcile her records." J.A. at 63. POC asserted that while 
she was not named, the "her" was an obvious reference to its 
director, Patricia Anderson, who performed these functions 
and was widely known to have done so. In the third state-
ment, the Committee explained recordkeeping errors by stat-
ing that "[d]uring this period, the Committee experienced 
significant difficulties with the vendor preparing the Primary 
Committee's reports." Id.

 In response to the lawsuit, appellees filed a motion arguing 
that 2 U.S.C. s 437d(c), the provision that provides statutory 
immunity for information disclosed at the FEC's request, 
mandated dismissal. The district court granted the defen-
dant's motion to dismiss, finding that the statements made by 
the Committee to the FEC were in fact "privileged against 
civil liability under s 437d(c)." Memorandum Opinion at 13 
(reprinted in J.A. at 18). The court determined that 
s 437d(c) set forth a "two-fold test" for immunity: "the 
statements must be (1) at the request (2) of the Commission." 
Memorandum Opinion at 7 (reprinted in J.A. at 12). The 
court determined that the report "contain[ed] unequivocal 
requests for information." Memorandum Opinion at 9 (re-
printed in J.A. at 14). The court also held that the second 
prong of s 437d(c) was satisfied, rejecting the argument that 

the audit staff was a separate entity from the Commission. 
However, the court declined to accept appellees' ambitious 
contention that all audit submissions necessarily constitute 
responses to Commission requests that fall within s 437d(c)'s 
scope.

 On appeal, appellants assert that the statements do not 
meet s 437d(c)'s bifurcated test. Noting that s 437d(c)'s 
grant of immunity is contingent on the issuance of a "re-
quest," appellants first contend that the statements in the 
Commission's interim report were not "requests." Appellants 
also assert that because the report was not issued by the 
Commission, but by its audit staff, which is an entity distinct 
from the Commission, the statements fail to meet the second 
prong of s 437d(c)'s test.

 II. Discussion

 The viability of appellants' libel suit turns on whether the 
allegedly defamatory statements fall within the immunity 
provision's scope. See 2 U.S.C. s 437d(c). Recalling the 
Supreme Court's holding that "in any case of statutory con-
struction, our analysis begins with the language of the stat-
ute," we turn to the text of s 437d(c). Hughes Aircraft Co. v. 
Jacobson, -- U.S. --, 119 S.Ct. 755, 760 (1999) (internal 
quotation marks omitted).

 That text is straightforward. Section 437d(c) provides that 
"n[o] person shall be subject to civil liability to any person 
(other than the Commission or the United States) for disclos-
ing information at the request of the [Federal Election] 
Commission." 2 U.S.C. s 437d(c). Thus, the contested state-
ments must be made in response to a request by the Commis-
sion.

A. "At the Request" Of
 We first determine whether the statements in this case 
were made "at the request" of the FEC and in that pursuit, 
we begin with a careful reading of the FEC's interim audit 
report. If we find there are such requests we will decide 
whether the Committee's statements were responsive to 
them. The first disputed statement is as follows:

 The auditors focused here on whether these contribu-
 tions were properly redesignated to the Compliance 
 Fund, but, in fact, in order to have been considered 
 primary contributions in the first instance, the regula-
 tions required that they be designated in writing for the 
 primary. Very few of them were so designated. The 
 Committee's vendor who processed these contributions 
 treated them as "redesignations" even though they were 
 not. That vendor's contract had been negotiated early in 
 the campaign by the Committee's original counsel and 
 included an incentive for the vendor to treat contribu-
 tions as though additional documentation or affidavit was 
 necessary. Under the contract, the vendor received an 
 additional amount per contribution for which additional 
 documentation or an affidavit was obtained. The Com-
 mittee staff did not see these contributions until well 
 after the election, but relied solely on the vendor's exper-
 tise to handle the contributions appropriately.
 
J.A. at 100 (emphasis in original).

 That statement directly responds to that portion of the 
interim report in which the audit staff contended that the 
Committee was conducting impermissible redesignations. In 
a section entitled "Receipt of Matching Funds in Excess of 
Entitlement," the interim audit report finds that the Commit-
tee received funds in excess of its actual eligibility, primarily 
due to the volume of improper redesignations. J.A. at 247-
51.3 In its conclusion to that section, the audit staff issued 
the following recommendation:

__________
 3 The auditors found that:

 [d]uring the period when the redesignations were being sought 
 for the contributions deposited into the Suspense Account, the 
 Committee continued to request and receive matching fund 
 payments based on ... statements that apparently did not 
 recognize contributions deposited into the suspense ac-
 count.... Therefore, as of September 2, 1992, the Candidate 
 had received matching funds in excess of his entitlement.
 
J.A. at 248-49.

 The Audit staff recommends that within 30 calendar days 
 of service of this report, the Committee provide evidence 
 to demonstrate that it did not receive matching funds in 
 excess of entitlement. Absent such a demonstration, the 
 Audit staff will recommend ... that the Committee 
 repay $3,674,353 to the U.S. Treasury.
 
J.A. at 251 ("Recommendation Ten") (emphasis added).

 Appellants' contention that this recommendation is not a 
request is hardly credible. Surely a recommendation that the 
committee "provide evidence" to demonstrate that it was not 
violating the law is a genuine request for more information in 
ordinary parlance and especially in the context of a govern-
ment audit.

 Moreover, even if this language were not sufficiently clear, 
the transmittal letter accompanying the audit report removes 
all doubts that Recommendation Ten was in fact a "request." 
Prominently featured in the letter accompanying the report is 
the following instruction:

 This report is to formally advise you of the findings and 
 recommendations of the Audit staff resulting from the 
 audit of the Clinton for President Committee. You are 
 requested to comply with the recommendations by May 4, 
 1994.
 
J.A. at 205 (emphasis added). Recommendation Ten, read in 
conjunction with the transmittal letter, clearly confirms that 
the report did in fact contain a specific request to which the 
Committee was responding in its first disputed statement.4

 Appellants accurately point out that the other two disputed 
statements were responsive to sections of the report in which 
the audit staff recommended that no further action be taken. 
See J.A. at 211, 212. From that fact, appellants argue that 

__________
 4 Appellants also argue that even if Recommendation Ten does 
constitute a request, the Committee's response is not material to 
the request. We may easily dismiss this contention. To the extent 
that the audit staff asserted that the excessive payments were due 
to unnecessary redesignations, appellees quite reasonably chose to 
address the necessity of such redesignations.

there is no need for any response and no reason to construe 
the audit report as calling for one. The second statement in 
which the Committee attributed misstatements in its account-
ing to errors by an unnamed computer vendor, was made in 
response to a section of the report entitled "Misstatement of 
Financial Activity." J.A. at 210-11. This section delineated 
discrepancies in the Committee's accounts and charged the 
Committee with failure to maintain supporting documentation 
that might have explained away these discrepancies. While 
this section of the audit report does not so clearly cry out for 
a response as Recommendation Ten, it confirms a clear 
implication of past wrongdoing by the Committee.

 For example, the audit report notes that although the 
Committee claimed to have identified all disbursements in its 
pre-audit inventory, further research by the auditors revealed 
"significantly different" disbursements. J.A. at 210-11. 
Moreover, the report states that although the Committee 
later corrected these misstatements, it failed to maintain the 
supporting documentation that would have allowed the audit 
staff to "identify the reasons for the misstatements." J.A. at 
211. The Committee could quite reasonably construe such a 
suggestion of accounting discrepancies and shoddy record-
keeping as a request for explanatory information, in the 
absence of which the auditors' tentative conclusion of wrong-
doing would remain on the record, even if no remedies were 
sought. The Committee's issuance of an explanatory state-
ment in an effort to account for the discrepancies falls within 
the scope of a "request."

 The third statement in which the Committee referred to 
difficulties with an unnamed vendor who prepared its reports, 
was made in response to a section entitled "Itemization of 
Receipts." J.A. at 211-12. Although this section of the audit 
report was admittedly more neutral so far as any implication 
of wrongdoing was concerned than the section just described, 
it essentially highlighted the Committee's failure to itemize 
its records. For example, the report noted that a significant 
percentage of the contributions which required itemization 
were not correctly itemized. J.A. at 211. Given the inevita-
bly tense atmosphere of an audit, especially one of a Commit-

tee which does ongoing business with the agency and whose 
members can be expected to be repeat supplicants for federal 
money, the auditee will understandably feel it imperative to 
provide answers to questions raised by the audit report. 
Additionally, it bears noting that the report was an interim 
one. Even the recommendation for no further action would 
not become final until the Commission acted upon it--hence 
the felt need of the subject to provide any exculpatory 
information.

 Importantly, in this case, there can be little question that 
the Committee's statements were relevant and responsive to 
the Commission's concerns. There is then no need to even 
consider appellees' contention that any information submitted 
within the context of an audit is immunized irrespective of 
whether it is germane to the Commission's report. The 
district court reasonably rejected appellees' assertion of an 
immunity so broad that it would include even gratuitous 
information that was not responsive to the concerns in the 
report.

 In sum, we hold that the Commission's report did indeed 
constitute a request for information in the three areas dis-
cussed and thus, the Committee's statements in response to 
these requests are immunized under s 437d(c). Having 
found that the statements meet s 437d(c)'s first request 
prong, we discuss briefly whether these requests were issued 
at the request "of the Commission."

B. "Of the Commission"

 Appellants allege that even if the statements were respon-
sive to requests contained in the audit report, this report was 
not issued by the Commission itself but by its audit staff, 
which under the statute constitutes a distinct entity.5 Thus, 

__________
 5 Appellants assert that there is a clear distinction between the 
Commission and its staff on the face of the statute. They emphasize 
that the statutory provision establishing the FEC states that it 
consists of "the Secretary of the Senate and the Clerk of the House 
of Representatives or their designees, ex officio and without the 
right to vote, and six members appointed by the President, by and 
with the advice and consent of the Senate." 2 U.S.C. s 437c(a)(1). 
On appellants' reading, any person who is not included within this 

appellants assert that even if the report did contain requests, 
the audit staff had no power to confer immunity under 
s 437d(c), since any immunity-conferring requests must be 
issued by the Commission itself. Appellants' strained distinc-
tion between the FEC and the staff working under its 
direction simply does not cut the mustard. We agree with 
the district court that "it was the Commission, acting pursu-
ant to its statutory authority, that conducted the interim 
audit." Memorandum Opinion at 11 (reprinted in J.A. at 16).6

 III. Conclusion

 For the foregoing reasons, we hold that the Committee's 
statements are immunized under s 437d(c). The decision of 
the district court is

 Affirmed.

__________
definition may not act on behalf of the Commission, so far as 
s 437d(c) is concerned. The district court dismissed appellants' 
argument noting that "this definition describes the membership of 
the Committee and not its duties. By contrast the focus of this case 
is the functions of the Commission." Memorandum Opinion at 10 
(reprinted in J.A. at 15).

 6 See, e.g., 2 U.S.C. s 438(b) ("The Commission may conduct 
audits and field investigations ... [p]rior to conducting any audit 
... the Commission shall perform an internal review of reports 
filed by selected committees."); 26 U.S.C. s 9038(a) ("After each 
matching payment period, the Commission shall conduct a thorough 
examination and audit."); 26 U.S.C. s 9040(b) ("The Commission is 
authorized ... to institute actions ... to seek recovery of any 
amounts determined to be payable to the Secretary as a result of an 
examination and audit made pursuant to section 9038."); 11 C.F.R. 
s 9038.1 (c)(1) (1994) ("The Commission will issue an interim audit 
report to the candidate and his or her authorized committee."); 11 
C.F.R. s 9038.1(c)(3) ("The Commission will consider any written 
legal and factual materials submitted by the candidate or his or her 
authorized committee.") (emphasis added in all citations).