HUGHES AIRCRAFT CO. ET AL. *v.* JACOBSON ET AL.

No. 97–1287.   Argued November 2, 1998—Decided January 25, 1999

*Paul T. Cappuccio* argued the cause for petitioners. With him on the briefs were *Kenneth W. Starr, Richard A. Cordray, Christopher Landau, Marcy J. K. Tiffany, T. Warren Jackson,* and *Robert F. Walker.*

*Lisa Schiavo Blatt* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Waxman, Deputy Solicitor General Kneedler, Marvin Krislov, James J. Keightley,* and *Stuart L. Brown.*

*Seth Kupferberg* argued the cause for respondents. With him on the brief were *Richard Dorn* and *I. Philip Sipser.**

---

*Briefs of *amici curiae* urging reversal were filed for the ERISA Industry Committee et al. by *Michael S. Horne, John M. Vine,* and *Caroline M. Brown;* and for the Hughes Aircraft Retirees Association et al. by *David E. Gordon.*

Briefs of *amici curiae* urging affirmance were filed for AT&T, RCA, and Boeing Employees by *Norman Zolot* and *Kent Cprek;* and for the

JUSTICE THOMAS delivered the opinion of the Court.

Five retired beneficiaries of a defined benefit plan, subject to the terms of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 832, as amended, 29 U. S. C. § 1001 *et seq.*, filed a class action lawsuit against their former employer, Hughes Aircraft Company (Hughes), and the Hughes Non-Bargaining Retirement Plan (Plan). They claim that Hughes violated ERISA by amending the Plan to provide for an early retirement program and a noncontributory benefit structure. The Ninth Circuit held that ERISA may prohibit these amendments. We reverse.

I

According to the complaint, Hughes has provided the Plan for its employees since 1955. Prior to 1991, the Plan required mandatory contributions from all participating employees, in addition to any contributions made by Hughes.[1] Section 3.1 of the Plan defines Hughes' funding obligations:

> "The cost of Benefits under the Plan, to the extent not provided by contributions of Participants . . . shall be provided by contributions of [Hughes] not less than in such amounts, and at such times, as the Plan Enrolled Actuary shall certify to be necessary, to fund Benefits under the Plan . . . ."

In addition, § 3.2 provides that Hughes' contributions shall not fall below the "amount necessary to maintain the quali-

National Employment Lawyers Association by *Stephen R. Bruce, Jeffrey Lewis,* and *Paula A. Brantner.*

*Mary Ellen Signorille* and *Melvin Radowitz* filed a brief for the American Association of Retired Persons as *amicus curiae.*

[1] This arrangement is commonly referred to as "contributory," as compared to a plan whose members do not make contributions, which is commonly referred to as "noncontributory." See generally S. Bruce, Pension Claims 22 (2d ed. 1993). But a contributory plan should not be confused with a "defined contribution plan" as defined by ERISA § 3(34), 29 U. S. C. § 1002(34).

fied status of the Plan . . . and to comply with all applicable legal requirements." But § 6.2 of the Plan gives Hughes "the right to suspend its contributions to the Plan at any time," so long as doing so does not "create an 'accumulated funding deficiency'" under ERISA.[2]

By 1986, as a result of employer and employee contributions and investment growth, the Plan's assets exceeded the actuarial or present value of accrued benefits by almost $1 billion. In light of this Plan surplus, Hughes suspended its contributions in 1987, which it has not resumed. Pursuant to the terms of the Plan, the employee contribution requirement remains operational.

Two amendments Hughes made to the Plan are the subject of the present litigation. In 1989, Hughes established an early retirement program that provided significant additional retirement benefits to certain eligible active employees. Subsequently, Hughes again amended the Plan to provide that, effective January 1, 1991, new participants could not contribute to the Plan, and would thereby receive fewer benefits. Existing members could continue to contribute or opt to be treated as new participants. The Plan obligations created by these amendments constitute the only use of the Plan's assets other than paying the pre-existing obligations under the original contributory benefit structure. The Plan's assets substantially exceed the minimum amount needed to fund all current and future defined benefits.

In January 1992, respondents filed this class action on behalf of all Plan participants who had contributed to the Plan and who are or may become eligible to receive benefits des-

---

[2] ERISA defines "accumulated funding deficiency" as

"the excess of the total charges to the funding standard account for all plan years (beginning with the first plan year to which this part applies) over the total credits to such account for such years or, if less, the excess of the total charges to the alternative minimum funding standard account for such plan years over the total credits to such account for such years." § 302(a)(2), 29 U. S. C. § 1082(a)(2).

ignated for contributing participants. The District Court granted Hughes' motion to dismiss the complaint for failure to state a claim. A divided panel of the Ninth Circuit reversed. 105 F. 3d 1288 (1997), amended, 128 F. 3d 1305 (1998). The majority concluded that the 1991 amendment may have terminated the Plan and created two plans: one consisting of pre-existing members and the other consisting of new participants. Distinguishing *Lockheed Corp.* v. *Spink,* 517 U. S. 882 (1996), as concerning a plan funded solely by *employer* contributions, the majority held that the act of amending the Plan triggered ERISA's fiduciary provisions. The majority also thought that the employees who were members of the contributory structure had a vested interest in the Plan's surplus.

Accordingly, the Court of Appeals concluded that respondents had alleged six causes of action in their complaint. Specifically, respondents claimed that Hughes had violated ERISA's prohibition against using employees' vested, nonforfeitable benefits to meet its obligations by depleting the surplus to fund the noncontributory structure. §203, 29 U. S. C. §1053(a). They further argued that Hughes had violated ERISA's anti-inurement prohibition, §403(c)(1), 29 U. S. C. §1103(c)(1), by benefiting itself at the expense of the Plan's surplus. Respondents also alleged that Hughes had breached its fiduciary duties under ERISA in three ways: amending the Plan in 1989 to fund a program outside of the Plan's purposes violated §404(a)(1)(D), 29 U. S. C. §1104(a)(1)(D); amending the Plan in 1991 to create the noncontributory structure violated §406(a)(1)(D), 29 U. S. C. §1106(a)(1)(D); and using the surplus assets to fund noncontributory benefits for those who had never contributed to the Plan violated §404, 29 U. S. C. §1104. Finally, respondents claimed that the alleged termination of the Plan had violated §4044(d)(3)(A), 29 U. S. C. §1344(d)(3)(A), which requires that residual assets in a terminated plan be distributed to its beneficiaries.

The dissenting judge concluded that the District Court properly dismissed the complaint. He reasoned that an amendment to a pre-existing plan does not affect the availability of the plan's pool of assets for funding pre-existing obligations and cannot be characterized as a termination; interpreted *Spink* to stand for the proposition that the act of amending a plan does not trigger fiduciary duties; and observed that employees who contribute to a defined benefit plan do not have an interest in that plan's surplus.

The majority's decision is in tension with our decision in *Spink*, where we held that "the act of amending a pension plan does not trigger ERISA's fiduciary provisions," 517 U. S., at 891, and with other Circuits' decisions. See, *e. g.*, *Brillinger* v. *General Elec. Co.*, 130 F. 3d 61 (CA2 1997), cert. pending, No. 97–1834; *American Flint Glass Workers Union* v. *Beaumont Glass Co.*, 62 F. 3d 574 (CA3 1995); *Malia* v. *General Elec. Co.*, 23 F. 3d 828 (CA3), cert. denied, 513 U. S. 956 (1994); *Johnson* v. *Georgia-Pacific Corp.*, 19 F. 3d 1184 (CA7 1994); *Phillips* v. *Bebber*, 914 F. 2d 31 (CA4 1990) *(per curiam)*. We granted certiorari, 523 U. S. 1093 (1998), and now reverse.

## II

Our review of the six claims recognized by the Ninth Circuit requires us to interpret a number of ERISA's provisions. As in any case of statutory construction, our analysis begins with "the language of the statute." *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 475 (1992). And where the statutory language provides a clear answer, it ends there as well. See *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 254 (1992).

## A

Respondents' vested-benefits and anti-inurement claims proceed on the erroneous assumption that they had an interest in the Plan's surplus, which, with respect to the anti-inurement claim, was used exclusively to benefit Hughes.

These claims fail because the 1991 amendment did not affect the rights of pre-existing Plan participants and Hughes did not use the surplus for its own benefit.

To understand why respondents have no interest in the Plan's surplus, it is essential to recognize the difference between defined contribution plans and defined benefit plans, such as Hughes'. A defined contribution plan is one where employees and employers may contribute to the plan, and "'the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide.'" *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 364, n. 5 (1980) (quoting *Alabama Power Co.* v. *Davis*, 431 U. S. 581, 593, n. 18 (1977)). A defined contribution plan "provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account." ERISA § 3(34); 29 U. S. C. § 1002(34). "[U]nder such plans, by definition, there can never be an insufficiency of funds in the plan to cover promised benefits," *Nachman, supra*, at 364, n. 5, since each beneficiary is entitled to whatever assets are dedicated to his individual account.

A defined benefit plan, on the other hand, consists of a general pool of assets rather than individual dedicated accounts. Such a plan, "as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment." *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U. S. 152, 154 (1993); see also *Mead Corp.* v. *Tilley*, 490 U. S. 714, 717 (1989); ERISA § 3(35), 29 U. S. C. § 1002(35). The asset pool may be funded by employer or employee contributions, or a combination of both. See ERISA § 204(c); 29 U. S. C. § 1054(c). But the employer typically bears the entire investment risk and—short of the consequences of plan termination—must cover any underfunding as the result of a shortfall that may occur from the plan's investments. See *Connolly* v. *Pension Benefit Guaranty Corporation*, 475 U. S. 211, 232 (1986) (O'CONNOR, J., concur-

440

ring); 2 J. Mamorsky, Employee Benefits Law § 8.04 (1998). Conversely, if the defined benefit plan is overfunded, the employer may reduce or suspend his contributions. See *Nachman, supra,* at 363–364, n. 5 (quoting *Alabama Power Co., supra,* at 593, n. 18) (noting that " 'the employer's contribution is adjusted to whatever level is necessary' " to provide the defined benefits).

The structure of a defined benefit plan reflects the risk borne by the employer. Given the employer's obligation to make up any shortfall, no plan member has a claim to any particular asset that composes a part of the plan's general asset pool. Instead, members have a right to a certain defined level of benefits, known as "accrued benefits." That term, for purposes of a defined benefit plan, is defined as "the individual's accrued benefit determined under the plan [and ordinarily is] expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U. S. C. § 1002(23)(A).[3] In order to prevent a subsequent downward adjustment in benefits below a member's contribution amount, a defined benefit plan participant has a nonforfeitable right to the greater of (1) the benefits provided under the plan or (2) an amount derived from the employee's accumulated contributions, determined using an interest rate fixed by statute. See § 204(c)(2)(B), 29 U. S. C. § 1054(c)(2)(B); see also § 3(23)(A), 29 U. S. C. § 1002(23)(A); § 204(c)(2)(C), 29 U. S. C. § 1054(c)(2)(C). Given this accumulated contribution floor, plan members generally have a nonforfeitable right only to their "accrued benefit," so that a plan's actual investment experience does not affect their statutory entitlement. Since a decline in the value of a plan's assets does not alter accrued benefits, members similarly have no entitlement to share in a plan's surplus—even

---

[3] By contrast, an "accrued benefit" for purposes of defined contribution plans means "the balance of the individual's account." ERISA § 3(23)(B), 29 U. S. C. § 1002(23)(B).

if it is partially attributable to the investment growth of their contributions.

Therefore, Hughes could not have violated ERISA's vesting requirements by using assets from the surplus attributable to the employees' contributions to fund the noncontributory structure. ERISA's vesting requirement is met "if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable," assuming that such are not limited to a certain percentage of benefits depending on the employee's years of service. §§ 203(a)(1)–(2), 29 U. S. C. §§ 1053(a)(1)–(2). The vesting provision "sets the minimum level of benefits an employee must receive after accruing specified years of service." *Teamsters* v. *Daniel,* 439 U. S. 551, 569 (1979). Otherwise, the "level of benefits" is determined by "the private parties, not the Government." *Alessi* v. *Raybestos-Manhattan, Inc.,* 451 U. S. 504, 511 (1981). Hence, this provision does not concern items such as a return on investment that fall outside of the definition of "accrued benefit." ERISA §§ 3(23)(A), 203(a); 29 U. S. C. §§ 1002(23)(A), 1053(a). Assuming that an employee's minimum accrued benefit is provided, this section is not implicated. Hughes never deprived respondents of their accrued benefits. Indeed, when it implemented the noncontributory structure, Hughes permitted the Plan's existing participants to switch into the new structure. Since respondents do not allege that Hughes has ever withdrawn accrued benefits or otherwise nonforfeitable interests from the pre-existing members, this vesting claim is meritless.

Respondents further contend that, even if they have no interest in the Plan's assets, the creation of the new contributory structure permitted Hughes to use assets from the surplus attributable to employer *and* employee contributions for its sole and exclusive benefit, in violation of ERISA's anti-inurement provision. This section provides, in relevant part:

> "[T]he assets of a plan [except as otherwise provided in the statute] shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." § 403(c)(1); 29 U. S. C. § 1103(c)(1).

As the language makes clear, the section focuses exclusively on whether fund assets were used to pay pension benefits to plan participants, without distinguishing either between benefits for new and old employees under one or more benefit structures of the same plan, or between assets that make up a plan's surplus as opposed to those needed to fund the plan's benefits. Respondents do not dispute that Hughes used fund assets for the sole purpose of paying pension benefits to Plan participants. Furthermore, at all times, Hughes satisfied its continuing obligation under the provisions of the Plan and ERISA to assure that the Plan was adequately funded. See Plan § 6.2; ERISA § 302, 29 U. S. C. § 1082. In other words, Hughes did not act impermissibly by using surplus assets from the contributory structure to add the non-contributory structure to the Plan. The act of amending a pre-existing plan cannot as a matter of law create two *de facto* plans if the obligations (both preamendment and post-amendment) continue to draw from the same single, unsegregated pool or fund of assets. ERISA provides an employer with broad authority to amend a plan, see *Curtiss-Wright Corp.* v. *Schoonejongen*, 514 U. S. 73, 78 (1995), and nowhere suggests that an amendment creating a new benefit structure also creates a second plan.[4] Because only one plan ex-

---

[4] Our conclusion is consistent with other Government pronouncements in this area. For example, the Internal Revenue Service has promulgated a treasury regulation that provides, for income tax purposes, a pension plan will not fail to be a "single plan" merely because the "plan has several distinct benefit structures." Treas. Reg. § 1.414(l)–1(b)(1)(i), 26 CFR

ists and respondents do not allege that Hughes used any of the assets for a purpose other than to pay its obligations to the Plan's beneficiaries, Hughes could not have violated the anti-inurement provision under ERISA § 403(c)(1).

## B

Each of respondents' fiduciary duty claims must fail because ERISA's fiduciary provisions are inapplicable to the amendments. This conclusion follows from our decision in *Spink*, where we considered whether amending a plan to require the conditioning of benefit payments under an early retirement program on the participants' release of employment-related claims was a prohibited transaction under ERISA § 406(a). 517 U. S., at 885. We explained:

> "Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. As we said with respect to the amendment of welfare benefit plans, '[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.' When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust." *Id.*, at 890 (quoting *Curtiss-Wright, supra*, at 78 (citations omitted)).

We made clear in *Spink* that our reasoning applied both to "pension benefit plans" and "welfare benefit plans," since "[t]he definition of fiduciary makes no distinction between persons exercising authority over" these different types of plans. 517 U. S., at 890–891. Our conclusion applies with equal force to persons exercising authority over a contribu-

---

§ 1.414(l)–1(b)(1)(i) (1998). It further provides that "[a] plan is a 'single plan' if and only if, on an ongoing basis, all of the plan assets are available to pay benefits to employees who are covered by the plan." *Ibid.;* see also 29 CFR § 2520.102–4 (1998) ("[A]n employee benefit plan may provide different benefits for various classes of participants and beneficiaries").

tory plan, a noncontributory plan, or any other type of plan. Our holding did not turn, as the Court of Appeals below thought, on the type of plan being amended for the simple reason that the plain language of the statute defining fiduciary makes no distinction. See *id.*, at 891; ERISA § 404(a), 29 U. S. C. § 1104(a) (specifying duties of a "fiduciary ... with respect to a plan"). Rather, it turned on whether the employer's act of amending its plan constituted an exercise of fiduciary duty. In *Spink*, we concluded it did not. 517 U. S., at 891.

The same act of amending here also does not constitute the action of a fiduciary, although Hughes' Plan happens to be one to which employees contribute. In general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets. See *id.*, at 890. ERISA's fiduciary duty requirement simply is not implicated where Hughes, acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated. See *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 91 (1983) (describing how ERISA does not mandate that "employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits").[5] A settlor's powers include the ability to add a new benefit structure to an existing plan. Re-

---

[5] Respondents suggest that they may be regarded as cosettlors because they have contributed to the Plan's corpus. However, merely making contributions does not make one akin to a settlor who is responsible for creating the plan. See generally G. Bogert, Law of Trusts and Trustees § 1, p. 4 (rev. 2d ed. 1984) ("The settlor of a trust is the person who intentionally causes it to come into existence" (footnote omitted; emphasis deleted)). Certainly, respondents do not contend that they are responsible for the creation of the Plan.

spondents' three fiduciary duty claims are directly foreclosed by *Spink*'s holding that, without exception, "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." 517 U. S., at 890.

Respondents attempt to circumvent this conclusion by arguing that the amendments amounted to a sham transaction. Specifically, respondents argue that Hughes—by effectively increasing certain employees' wages through either providing increased retirement incentives or including those employees in the Plan's noncontributory structure—reduced its labor costs by spending down the Plan's surplus to cover its own obligations. In *Spink*, we noted in passing that if a transaction constituted "merely a sham transaction, meant to disguise an otherwise unlawful transfer of assets to a party in interest, . . . that might present a different question." *Id.*, at 895, n. 8. Even assuming that a sham transaction may implicate a fiduciary duty, the incidental benefits conferred upon Hughes when it amended the Plan are not impermissible under the statute. It is irrelevant whether Hughes received lower labor costs or other such incidental benefits from implementing the noncontributory structure under the 1991 amendment. As we noted in *Spink:*

> "[A]mong the 'incidental' and thus legitimate benefits that a plan sponsor may receive from the operation of a pension plan are attracting and retaining employees, paying deferred compensation, settling or avoiding strikes, providing increased compensation without increasing wages, increasing employee turnover, and reducing the likelihood of lawsuits by encouraging employees who would otherwise have been laid off to depart voluntarily." *Id.*, at 893–894 (citation omitted).

Receipt of these types of benefits no more constitutes a breach of fiduciary duties than they would constitute improper inurement or otherwise violate ERISA. To find that

such benefits somehow violated the statute would forestall employers' efforts to implement a pension plan. ERISA, by and large, is concerned with "ensur[ing] that employees will not be left emptyhanded once employers have guaranteed them certain benefits," *id.*, at 887, not with depriving employers of benefits incidental thereto. In sum, respondents have failed to show that Hughes labored under fiduciary duties or engaged in a sham transaction.

## C

Finally, respondents allege that the 1991 amendment requires a court to order petitioners to terminate the Plan. ERISA itself plainly spells out the circumstances under which a plan terminates. In a section entitled, "[e]xclusive means of plan termination," the statute provides:

> "Except in the case of a termination for which proceedings are otherwise instituted by the [Pension Benefit Guaranty Corporation] as provided in section 1342 of this title, a single-employer plan may be terminated only in a standard termination under subsection (b) of this section or a distress termination under subsection (c) of this section." § 4041(a)(1), as set forth in 29 U. S. C. § 1341(a)(1).

Subsections (b) and (c) concern the two ways by which an employer may voluntarily terminate a plan. See 29 U. S. C. §§ 1341(b) and (c); see also *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 638–639 (1990). Based on the language of the statute, these means constitute the sole avenues for voluntary termination. See *Germain,* 503 U. S., at 254 (explaining that Congress "says in a statute what it means and means in a statute what it says there").

Respondents concede that no voluntary termination has occurred, but nevertheless contend that the 1991 amendment worked an effective termination based on the common-law

theory of a wasting trust. Under common law, a wasting trust is a trust whose purposes have been accomplished, such that the continuation of the trust would frustrate the settlor's intent. See generally 4 A. Scott, Law of Trusts §§ 334, 337, 337.8 (4th ed. 1989); G. Bogert, Law of Trusts and Trustees §§ 1002, 1007 (2d rev. ed. 1983). This claim also fails.

As an initial matter, because ERISA is a "comprehensive and reticulated statute," *Nachman,* 446 U. S., at 361, and is "enormously complex and detailed," *Mertens* v. *Hewitt Associates,* 508 U. S. 248, 262 (1993), it should not be supplemented by extratextual remedies, such as the common-law doctrines advocated by respondents. See *Guidry* v. *Sheet Metal Workers Nat. Pension Fund,* 493 U. S. 365, 376 (1990) (explaining that, "[a]s a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text"). Although trust law may offer a "starting point" for analysis in some situations, it must give way if it is inconsistent with "the language of the statute, its structure, or its purposes." *Varity Corp.* v. *Howe,* 516 U. S. 489, 497 (1996). Application of the wasting trust doctrine in this context would appear to be inconsistent with the language of ERISA's termination provisions.

Even assuming that the wasting trust doctrine might apply in certain circumstances—an extremely doubtful proposition—it is by its own terms inapplicable here. As respondents concede, since the date of the 1991 amendment, the Plan has been accepting new members and paying all the promised benefits to eligible Plan participants. Furthermore, thousands of active participants in the contributory benefit structure continue to accrue benefits. Simply put, these circumstances can in no way be construed to constitute an enfeebled plan whose membership has dwindled to a mere remnant that would no longer benefit from the Plan's admin-

istration. Therefore, the wasting trust doctrine cannot salvage respondents' termination claim.

*    *    *

The judgment of the Court of Appeals is therefore reversed.

<em>It is so ordered.</em>