# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-2214

_____

Carol Harley, et al.,                    *
                                         *
   Plaintiffs - Appellants,          *
                                         *
v.                                       *
                                         *
Minnesota Mining and Manufacturing       *
Company,                                 *
                                         *
   Defendant - Appellee.             *

_____                              Appeals from the United States
                                         District Court for the
No. 01-1213                              District of Minnesota.

_____

Carol Harley, et al.,                    *
                                         *
   Plaintiffs - Appellants,          *
                                         *
v.                                       *
                                         *
Guillo Agostini, et al.,                 *
                                         *
   Defendants - Appellees.           *

_____

Submitted:  March 12, 2001

Filed:  March 26, 2002

_____

Before LOKEN, MURPHY, and BYE, Circuit Judges.
_____

LOKEN, Circuit Judge.

These are two class actions against Minnesota Mining and Manufacturing Company ("3M") and certain 3M employees by participants and beneficiaries of the 3M Employee Retirement Income Plan (the "Plan"). The Plan is subject to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. Plaintiffs allege that 3M breached its fiduciary duties under ERISA by failing to adequately investigate and monitor a $20 million investment of Plan assets in a hedge fund, and by failing to discover and remedy a prohibited transaction involving the fund advisor's compensation. Plaintiffs appeal the district court's[1] grant of summary judgment dismissing their claims. The principal issue is whether the court erred in dismissing plaintiffs' failure to investigate and monitor claims because the Plan is a defined benefit plan with a substantial surplus. We affirm.[2]

## I. Background.

3M is responsible for directing the investment of Plan assets, a responsibility delegated to 3M's Pension Asset Committee (the "PAC"). In exercising this discretionary authority, both 3M and the PAC are Plan fiduciaries. See 29 U.S.C. § 1002(21)(A). This action arose out of a $20 million investment of Plan assets in the Granite Corporation ("Granite"), a hedge fund that invested primarily in collateralized

_____

[1] The HONORABLE JOHN R. TUNHEIM, United States District Judge for the District of Minnesota.

[2] The court has received and considered amicus briefs from the Secretary of Labor and the American Association of Retired Persons on behalf of plaintiffs, and from the Association of Private Pension and Welfare Plans and the ERISA Industry Committee on behalf of 3M.

mortgage obligations (CMOs) – fixed income securities that are derived from and secured by pools of private home mortgages.[3] Granite was marketed to 3M's pension staff as an investment that would "maximize a consistent rate of return" for its investors while investing in "low risk instruments." Achieving a high rate of return hinged on using leverage, which increased the risk to investors from changes in market interest rates. Granite represented that it would hedge this risk by using sophisticated quantitative models to maintain a market-neutral investment position.

The Plan invested in Granite in 1990. The value of its Granite investment increased to $34 million by February 1994, but a significant rise in interest rates in March 1994 devastated the CMO market. Granite declared bankruptcy in April 1994, and the Plan lost its entire investment.[4] On the other hand, between 1993 and 1998, 3M's voluntary contributions to the Plan exceeded ERISA's minimum funding requirements by $683 million, and the fair market value of the Plan's assets increased from approximately $3.4 billion in 1995 to over $6.3 billion in 1999. The Plan has never failed to pay benefits to its beneficiaries over its sixty-seven year life.

In investing Plan assets, a fiduciary must act "with the care, skill, prudence, and diligence [of] a prudent man acting in a like capacity and familiar with such matters." Felber v. Estate of Regan, 117 F.3d 1084, 1086 (8th Cir. 1997), quoting 29 U.S.C. § 1104(a)(1)(B). A fiduciary that breaches this duty is liable "to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a).

---

[3]For a description of CMOs and the investment risks they entail, see Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1022-23 (4th Cir. 1997).

[4]The Plan has joined a lawsuit against Granite's investment advisor and various broker-dealers that sold CMOs to Granite in which plaintiffs allege fraud based on Granite's failure to maintain a market neutral position and on the overvaluing of Granite securities. See ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F. Supp. 1308, 1317 (S.D.N.Y. 1997).

The Secretary of Labor and plan participants, beneficiaries, and fiduciaries may sue "for appropriate relief under section 1109." 29 U.S.C. § 1132(a)(2).

Plaintiffs filed this action in June 1996, alleging that 3M is liable to the Plan under § 1109 because it breached its fiduciary duties by failing to investigate Granite adequately prior to investing in 1990; by thereafter failing to monitor properly the Granite investment; and by allowing the Plan to enter into a prohibited performance-based compensation agreement with Granite's investment advisor. Following discovery, the district court granted 3M summary judgment on the prohibited transaction claim because plaintiffs presented no evidence that the challenged compensation was unreasonable. Harley v. Minnesota Mining & Mfg. Co., 42 F. Supp. 2d 898, 911 (D. Minn. 1999). The court denied 3M summary judgment on the failure to investigate and monitor claims because "a reasonable fact finder could conclude that 3M's investigatory and monitoring methods and actions were below ERISA's standard of reasonable care." 42 F. Supp. 2d at 907. However, the court ruled that the Plan did not suffer a remediable loss if 3M's voluntary contributions created an offsetting surplus and invited further discovery and a renewed motion for summary judgment on that issue. Id. at 914-15. After this ruling, plaintiffs filed the second action asserting the same claims against seven members of 3M's PAC.

After further discovery on the surplus issue, 3M renewed its motion for summary judgment. The district court concluded that the Plan has a sufficient surplus and dismissed the failure to investigate and monitor claims because the Granite investment caused no "losses to the plan" for purposes of 29 U.S.C. § 1109(a). In a subsequent order, the court held that the claims against the PAC defendants are barred by collateral estoppel and dismissed plaintiffs' second suit. Plaintiffs appeal the dismissal of their claims in both actions.

-4-

## II. The Failure To Investigate and Monitor Claims.

Plaintiffs allege that 3M violated the prudent-man standard of care when it invested Plan assets in Granite without adequate investigation and monitoring. To recover, plaintiffs must prove a breach of this fiduciary duty and loss to the Plan. See Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917 (8th Cir. 1994). The district court concluded that plaintiffs could not prove the requisite loss to the Plan:

> The Court believes, in the unique circumstances of this case, that if 3M indeed has contributed amounts sufficient to put the Plan's portfolio in a surplus position, the Granite investment has not caused [plaintiffs] or the Plan any cognizable harm.

42 F. Supp. 2d at 912. The "unique circumstances" to which the court referred are the relevant features of a defined benefit plan, which were recently described by the Supreme Court in Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439-40 (1999) (quotations omitted):

> Such a plan, as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment. . . . [T]he employer typically bears the entire investment risk and -- short of the consequences of plan termination -- must cover any underfunding as the result of a shortfall that may occur from the plan's investments. . . . Given the employer's obligation to make up any shortfall, no plan member has a claim to any particular asset that composes a part of the plan's general asset pool. . . . Since a decline in the value of a plan's assets does not alter accrued benefits, members similarly have no entitlement to share in a plan's surplus . . . .

On appeal, plaintiffs and the Secretary of Labor as amicus vigorously attack the district court's conclusion that there was no loss to the Plan. The Secretary warns that a decision "that an employer-fiduciary is not liable for losses caused by fiduciary

-5-

breaches when a defined benefit pension plan is overfunded will have a substantial impact on the ability of the Secretary to enforce the statute." We agree that the district court's focus on "losses to the plan" -- an essential element of the fiduciary's liability under § 1109(a) -- was misplaced. If there is no loss to the plan, then no one may recover from the fiduciary on behalf of the plan, including the Secretary. That is far more than need be decided in this case. Moreover, the district court's conclusion that there was no loss to the Plan seems contrary to the plain meaning of § 1109(a). 3M concedes, as it must, that the Plan's $20 million investment in Granite became worthless after Granite declared bankruptcy in April 1994. This loss reduced the pool of Plan assets. We cannot agree with the court that "the Granite investment has not caused . . . the Plan any cognizable harm." 42 F. Supp. 2d at 912.

But that does not mean we disagree with the district court's decision to dismiss these claims. In our view, the proper focus is on whether plaintiffs have standing to bring an action under § 1132(a)(2) to seek relief under § 1109 for this particular breach of duty, given the unique features of a defined benefit plan as identified in Hughes Aircraft. In a defined benefit plan, if plan assets are depleted but the remaining pool of assets is more than adequate to pay all accrued or accumulated benefits, then any loss is to plan surplus. As Hughes Aircraft made clear, plaintiffs as Plan beneficiaries have no claim or entitlement to its surplus. If the Plan is overfunded, 3M may reduce or suspend its contributions. See Hughes Aircraft, 525 U.S. at 440. If the Plan's surplus disappears, it is 3M's obligation to make up any underfunding with additional contributions. If the Plan terminates with a surplus, the surplus may be distributed to 3M. See 29 U.S.C. § 1344(d); Dame v. First Nat'l Bank of Omaha, 217 F.3d 1018, 1019 (8th Cir. 2000). Thus, the reality is that a relatively modest loss to Plan surplus is a loss only to 3M, the Plan's sponsor.

In these circumstances, we agree with the other half of the district court's conclusion -- "the Granite investment has not caused [plaintiffs] . . . any cognizable harm." 42 F. Supp. 2d at 912. The question, then, is whether plaintiffs may

nonetheless sue under 29 U.S.C. § 1132(a)(2) to recover on behalf of the Plan. We answer that question in the negative because, in our view, two critical factors support this construction of these ERISA remedial provisions.

First, a contrary construction would raise serious Article III case or controversy concerns. The doctrine of standing serves to identify cases and controversies that are justiciable under Article III. An "irreducible constitutional minimum of standing" is that "plaintiff must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quotations and citations omitted). Although a statute may broaden the class of redressable injuries, the Supreme Court has never held that Congress may do away with the Article III requirement of "concrete injury." Id. at 578. These concerns have led the Court to construe the antitrust standing conferred by Section 4 of the Clayton Act, 15 U.S.C. § 15 ("any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws") as not extending to injuries that are too remote or indirect or speculative. See, e.g., Associated Gen'l Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535-46 (1983). Thus, the limits on judicial power imposed by Article III counsel against permitting participants or beneficiaries who have suffered *no* injury in fact from suing to enforce ERISA fiduciary duties on behalf of the Plan.

Unlike the dissent, we do not find this concern resolved by dicta in the Supreme Court's recent decision in Vermont Agency of Natural Res. v. United States ex. rel Stevens, 529 U.S. 765, 772 (2000), that designation as a statutory agent for another party "would perhaps suffice" to confer standing to recover an injury suffered by that party. In § 1132(a)(2), Congress generally authorized the Secretary, participants, beneficiaries, and fiduciaries to sue for appropriate relief on behalf of the plan. If the statute authorized any stranger to the plan to bring such an action, would that suffice to confer standing? Surely not, for "Article III forecloses the

conversion of courts of the United States into judicial versions of college debating forums." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 473 (1982). The question in Vermont Agency was the standing of private parties to bring *qui tam* lawsuits on behalf of the United States. The Court answered that question in the affirmative for two reasons. First, the *qui tam* statute partially assigned the government's claim to the private *qui tam* relator; here, on the other hand, § 1132(a)(2) contains no such assignment. Second, the long tradition of *qui tam* actions in England and the American colonies persuaded the Court that such actions are cases and controversies for purposes of Article III standing. By contrast, the law of trusts is the starting point in interpreting and applying ERISA's fiduciary duties. See, e.g., Varity Corp. v. Howe, 516 U.S. 489, 496-97 (1996). Under the law of trusts, "[a] particular beneficiary cannot maintain a suit for a breach of trust which does not involve any violation of duty to him." RESTATEMENT (SECOND) OF TRUSTS § 214 cmt. b.

Second, "[t]he primary purpose of [ERISA] is the protection of individual pension rights." H.R. REP. NO. 93-533 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4639. Thus, the basic remedy for a breach of fiduciary duty is "to restor[e] plan participants to the position in which they would have occupied but for the breach of trust." Martin v. Feilen, 965 F.2d 660, 671 (8th Cir. 1992) (quotation omitted). Here, the ongoing Plan had a substantial surplus before and after the alleged breach and a financially sound settlor responsible for making up any future underfunding. The individual pension rights of Plan participants and beneficiaries are fully protected. Indeed, those rights would if anything be adversely affected by subjecting the Plan and its fiduciaries to costly litigation brought by parties who have suffered no injury from a relatively modest but allegedly imprudent investment. Thus, the purposes underlying ERISA's imposition of strict fiduciary duties are not furthered by granting plaintiffs standing to pursue these claims. In addition to the Article III constitutional limitations, prudential principles bear on the question of standing. One of those principles is to require that "plaintiff's complaint fall within the zone of interests to

be protected or regulated by the statute . . . in question. <u>Valley Forge</u>, 454 U.S. at 475 (quotation omitted).

For these reasons, we conclude that plaintiffs' failure to investigate and monitor claims were properly dismissed if the Plan's surplus was sufficiently large that the Granite investment loss did not cause actual injury to plaintiffs' interests in the Plan.

Plaintiffs challenge the district court's conclusion that the Plan's surplus is adequate for this purpose as a matter of law. Plaintiffs argue that 3M must establish that the Plan is fully funded "using the methodology mandated by ERISA." In this regard, plaintiffs posit that ERISA mandates use of either the plan-termination valuation method prescribed when a defined benefit plan is spun off, transferred, or merged into another, <u>see</u> 29 U.S.C. § 1058; or the method of determining whether a plan is fully funded in the "RPA 94" minimum funding standard adopted by Congress in 1994 to assure that defined benefit plans are adequately funded, <u>see</u> 29 U.S.C. § 1082(d). (For an explanation of the RPA 94 standard, see H.R. REP. NO. 103-826, at 209 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 3981.)

In our view, plaintiffs frame this issue incorrectly. Surplus is not an affirmative defense that 3M must prove. Rather, absence of adequate surplus is an element of plaintiffs' standing under § 1132(a)(2) -- proof they are suing to redress a loss to the Plan that is an actual injury *to themselves*. Plaintiffs have no evidence that the Plan will terminate in the foreseeable future. Therefore, they may not satisfy this element by proposing a termination valuation method because a hypothetical termination has no relevance to the issue of whether they have suffered injury in fact. As the district court observed, "ERISA does not require [ongoing] plans to maintain funding at termination levels, a fact that the Supreme Court implicitly recognized in <u>Hughes</u>." (Mar. 29, 2000 Mem. & Order at 13.) Likewise, the district court properly rejected plaintiffs' contention that the Plan must be 100% fully-funded under the RPA 94

valuation method. The statute does not use that funding level to determine whether additional contributions are required, and 3M has never been required to make an additional contribution.

We agree with the district court that "[b]y nearly any measure, the 3M Plan is a robust, richly-funded, ongoing plan." (Id. at 18.) The actuarial value of the Plan's assets exceeded its actuarial accrued liabilities in 1993, before Granite's bankruptcy, and in every year thereafter. 3M has contributed $683 million more than its minimum funding requirements since the loss of the $20 million Granite investment. Plaintiffs failed to prove the absence of a substantial surplus under any relevant valuation method. In these circumstances, the failure to investigate and monitor claims were properly dismissed because plaintiffs suffered no injury-in-fact.[5]

## III. The Prohibited Transaction Claim.

The Plan agreed to pay Granite's investment advisor, Askin Capital Management ("ACM"), a fee contingent on the success of the Granite investment. The Plan paid ACM approximately $1.17 million in March 1993, the only fee paid during the life of the investment. ACM was a Plan fiduciary because it had discretion to invest on behalf of the Plan. Plaintiffs argue that ACM's fee arrangement violated the prohibition against a fiduciary dealing with plan assets for its own account, see 29 U.S.C. § 1106(b)(1), because ACM determined the value of Granite's holdings without an independent valuation; and that 3M breached its fiduciary duty to the Plan by failing to discover and remedy this prohibited transaction, see 29 U.S.C. § 1105(a)(2). The district court dismissed this claim because plaintiffs presented no evidence the ACM fee was unreasonable. 42 F. Supp. 2d at 909-11. We agree.

---

[5]This decision does not insulate a fiduciary who invests the assets of an overfunded defined benefit plan from liability to the plan for breach of the duty to invest prudently. Both the Secretary of Labor and any party with a reversionary interest in the plan's surplus have standing to sue under 29 U.S.C. § 1132(a)(2).

Section 1106(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." However, § 1108(c)(2) provides that "[n]othing in section 1106 of this title shall be construed to prohibit any fiduciary from . . . receiving any reasonable compensation for services rendered . . . in the performance of his duties with the plan." 3M introduced uncontradicted expert testimony that the compensation paid to ACM was reasonable.

Plaintiffs counter this factual showing with a legal argument -- that § 1108(c)(2) does not apply to prohibited transactions under § 1106(b) but only clarifies the exemption provided in § 1108(b)(2). Plaintiffs rely for this argument on their interpretation of a regulation, 29 C.F.R. § 2550.408c-2(a). But in this case, the general prohibition in § 1106(b)(1) -- that a fiduciary should not deal in plan assets for its own account -- is alleged to have been violated when a fiduciary influenced its own compensation for investment services. At least in this situation, the plain language of § 1108(c)(2) sensibly insulates the fiduciary from liability if the compensation paid was reasonable. We reject plaintiffs' reading of the ambiguous regulation because it conflicts with an unambiguous statute. Moreover, the legislative history of § 1108 does not support the contention that the § 1108(c)(2) exemption merely clarifies § 1108(b)(2). See, e.g., H.R. CONF. REP. NO. 93-1280 (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5092; Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1216 & n.4 (2d Cir. 1987). Thus, summary judgment was proper because plaintiffs failed to rebut the uncontradicted evidence that ACM's compensation was reasonable.

For the foregoing reasons, we affirm the grant of summary judgment dismissing plaintiffs' claims against 3M. Because those claims were properly dismissed on the merits, we need not consider plaintiffs' contention that the district court's class notice omitted pertinent information and was not fair and neutral.

### IV. Dismissal of the Claims Against PAC Members.

In the second case, plaintiffs sued seven members of 3M's Pension Assets Committee asserting the same breaches of fiduciary duty. This action was stayed by stipulation until the district court ruled on the issue of whether the Plan had an adequate surplus. The district court then granted summary judgment in this action, concluding that collateral estoppel bars plaintiffs' failure to investigate and monitor and prohibited transaction claims against the PAC defendants. Plaintiffs appeal, arguing that collateral estoppel does not bar the failure to investigate and monitor claims because the district court's decision in favor of 3M was based upon a "special defense" available only to fiduciary-employers. Collateral estoppel bars these claims only if the PAC defendants are entitled to summary judgment on an issue that was "actually and necessarily determined" in plaintiffs' action against 3M. United States v. Gurley, 43 F.3d 1188, 1198 (8th Cir. 1994).

Plaintiffs assert that the district court erred in concluding that the PAC defendants' "liability is identical to that of the employer [3M] for the purpose of establishing the required element of a loss to the Plan." But we have not affirmed the district court's ruling that the Plan's surplus meant there were no "losses to the plan." Rather, we conclude that the Plan's surplus deprived plaintiffs of standing to sue because they suffered no injury in fact. This conclusion applies as well to defeat plaintiffs' claims against the PAC defendants. Thus, the Plan surplus issue, which was "actually and necessarily" litigated in the 3M case, bars plaintiffs' claims in this second case by reason of the doctrine of collateral estoppel.

In this second appeal, plaintiffs again challenge the merits of the district court's decision dismissing their claims against 3M. We reject these contentions for the reasons stated in Parts II and III of this opinion.

The judgments of the district court are affirmed.

-12-

BYE, Circuit Judge, concurring in part and dissenting in part.

I agree the district court erred by concluding the collapse of Granite caused no loss to the Plan. I also agree with the court's resolution of the prohibited transaction claim. But I disagree the plaintiffs lack standing to bring breach of fiduciary duty claims under 29 U.S.C. § 1132(a)(2).

The court sidesteps the question whether, consistent with Article III, plan participants or beneficiaries may bring claims under § 1132(a)(2) for injuries suffered only by the Plan, reasoning that such a construction "would raise serious Article III case or controversy concerns." Ante at 7. But we do not have the luxury of avoiding that construction. Section 1132(a)(2) only permits participants or beneficiaries to bring suit *in a representative capacity* to remedy an injury to the Plan itself. Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 n.9, 144 (1985); see also Physicians Healthchoice, Inc. v. Trs. of Auto. Employee Benefit Trust, 988 F.2d 53, 55 (8th Cir. 1993). Thus, we have no choice but to address the Article III question head-on.

I believe the plaintiffs have standing. They satisfy the case-or-controversy requirements of Article III by standing in the shoes of a party that clearly has standing — the Plan itself. In Vt. Agency of Natural Res. v. United States ex. rel Stevens, the Supreme Court held a *qui tam* relator had Article III standing to sue under the False Claims Act because the United States had partially assigned its claim to the relator. 529 U.S. 765, 773 (2000). But the Supreme Court also suggested a person has standing to bring an action on behalf of a complaining party, so long as the person has no individual interest in the case, and is "simply the statutorily designated agent of the [complaining party]." Id. at 772. The latter point proves instructive in this case because § 1132(a)(2) authorizes plan participants and beneficiaries to bring claims on behalf of the Plan (the complaining party), but not on their own behalf. See Russell, supra. Therefore, under Stevens, I believe the plaintiffs may bring suit under § 1132(a)(2) because the Plan's injuries suffice to confer Article III standing.

-13-

I do not find the court's reliance on the "zone of interests" test particularly helpful in deciding whether the plaintiffs have standing. The Plan beneficiaries are certainly not strangers to the Plan, ante at 7, and § 1132(a)(2) authorizes them to represent the Plan irrespective of whether the fiduciary breach affects a defined benefit plan or a defined contribution plan. The zone of interests test presents a question of "*statutory* standing," Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 97 (1998) (emphasis in original), with prudential standing requirements satisfied "when the *injury* asserted by a plaintiff arguably falls within the zone of interests to be protected or regulated by the statute in question." Fed. Election Comm'n v. Akins, 524 U.S. 11, 20 (1998) (internal punctuation and quotation omitted) (emphasis added). Here, the Plan's injuries are at issue, and the plaintiffs' suit certainly satisfies the "statutory" zone of interests tests when the statute itself authorizes plan beneficiaries to act for the Plan in a representative capacity.

I respectfully dissent in part.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-