# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-3654

_____

Carol Harley; Lenora Banaszewski;      *
Michael Payton, individually, and on   *
behalf of all others similarly situated, *
                                       *
                                       *
      Plaintiffs - Appellants,         *
                                       *
                                       *
      v.                               *
                                       *
Richard Zoesch,                        *
                                       *
      Plaintiff,                       *      Appeals from the United States
                                       *      District Court for the
      v.                               *      District of Minnesota.
                                       *
Guilio Agostini; Michael J. Barrett;   *
Larry E. Eaton; Harry A. Hammerly;     *
Richard A. Lidstad; Dwight A.          *
Peterson; John J. Ursu,                *
                                       *
      Defendants - Appellees.          *

_____

No. 03-3655

_____

Carol Harley; Lenora Banaszewski;      *
Michael Payton, individually, and on   *
behalf of all others similarly situated; *
                                       *
      Plaintiffs - Appellants,         *

```
                                          *
Richard Zoesch,                           *
                                          *
        Plaintiff,                        *
                                          *
    v.                                    *
                                          *
Minnesota Mining and Manufacturing        *
Company,                                  *
                                          *
        Defendant - Appellee.             *
```

_____

Submitted: June 16, 2004
Filed: June 28, 2005

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON, and BYE, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Participants and beneficiaries (hereinafter "Participants") of a pension plan appeal from the district court's orders denying their motions to vacate its judgments under Federal Rule of Civil Procedure 60(b). In earlier proceedings, Participants of the Minnesota Mining and Manufacturing Company ("3M") Employee Retirement Income Plan brought two class actions against 3M and certain of its employees alleging that 3M breached its fiduciary duties under ERISA, the Employee Retirement Income Security Act. The district court[1] entered summary judgments for 3M and its employees, and this Court affirmed in a consolidated appeal. Within one year of the filing of this Court's opinion, the Participants moved for relief from judgment in both

_____

[1]The Honorable John R. Tunheim, District Judge for the United States District Court for the District of Minnesota.

related cases under Rule 60(b), on the grounds that 3M obtained the summary judgments through misrepresentations about the Plan's funding. Participants appealed the district court's denials of both motions, and the appeals were consolidated. We affirm.

3M sponsors the 3M Employee Retirement Income Plan, a "defined benefit plan" subject to the terms of ERISA. See 29 U.S.C. § 1002 (35). As a defined benefit plan, the Plan is obligated to pay a fixed level of benefits to its participants upon retirement. The Plan included thousands of participants and beneficiaries and contained total assets in excess of $4 billion. 3M and its Pension Asset Committee, which directs the investment of Plan assets, are both Plan fiduciaries.

In 1990 the Committee invested $20 million of Plan assets in the Granite Corporation, a hedge fund that invested primarily in collateralized mortgage obligations--fixed income securities that are derived from and secured by pools of private home mortgages. In March 1994, a significant rise in interest rates devastated the value of Granite's portfolio. At the same time, Granite was severely leveraged and brokerage firms began demanding additional money to serve as margin. Granite was forced to declare bankruptcy and was ultimately liquidated. The Plan lost its entire investment in Granite.

Participants filed suit against 3M in June 1996, alleging that 3M was liable to the Plan under 29 U.S.C. § 1109 for breaching its fiduciary duties. They claimed that 3M failed to investigate Granite adequately before investing, failed to monitor the Granite investment properly, and allowed the Plan to enter into a prohibited performance-based compensation agreement with Granite's investment advisor that created a conflict of interest.

The district court granted 3M summary judgment on the prohibited transaction claim because Participants presented no evidence that the compensation agreement

was unreasonable. The district court denied summary judgment on the failure to investigate and monitor claims, indicating that further discovery was needed to determine whether Participants could establish an essential element of their claim--a loss to the Plan. The district court relied on the Supreme Court's decision in Hughes Aircraft Co. v. Jacobson, 525 U.S. 432 (1999), to conclude that participants in defined benefit pension plans have no entitlement to surplus funds. If the Plan had a surplus, Participants would not be able to establish a loss to the Plan. After this ruling, Participants filed the second action asserting the same claims against seven members of the Committee.

After further discovery on the surplus issue, 3M renewed its motion for summary judgment. The parties proposed a number of possible methods for measuring whether the Plan had a surplus. The district court determined that, since "the 3M Plan is a robust, richly-funded, ongoing plan," it was appropriate to measure surplus according to the Retirement Protection Act of 1994 ("the Act"), rather than under the termination method advocated by Participants. Order of March 29, 2000, slip op. at 18. The Act requires plan sponsors to make contributions when a plan's "funded current liability percentage" is less than 90%. The funded current liability percentage is calculated by dividing the value of the plan's assets by the plan's current liability, using ERISA-mandated interest rates and mortality tables. Because there was "no dispute that the Plan's funding has exceeded the 90% threshold every year since the Granite loss," the court concluded that the Plan was fully funded and therefore the Granite investment caused no loss to the Plan. Id. Participants could not meet an essential element of liability–loss to the Plan–so the court granted 3M's motion for summary judgment. In a later order, the court dismissed the Participants' second suit, holding that the claims against the Committee defendants are barred by collateral estoppel.

Participants appealed the summary judgments in both suits to this Court, and we affirmed. Harley v. Minnesota Mining & Mfg. Co., 284 F.3d 901 (8th Cir. 2002).

-4-

On the prohibited transaction claim, we agreed with the district court that Participants presented no evidence that the compensation agreement was unreasonable. On the failure to investigate and monitor claims, we affirmed the district court but disagreed that the Plan suffered no cognizable harm. The Plan's $20 million investment in Granite became worthless after Granite declared bankruptcy in April 1994, and this constitutes a loss to the Plan according to the plain meaning of section 1109(a).

Instead, we affirmed the dismissal of these claims because Participants lacked standing to bring an action under section 1132(a)(2). Hughes Aircraft made clear that Participants have no claim or entitlement to a defined benefit plan's surplus. In this case, the Granite loss may have depleted plan assets, but if the remaining assets were more than adequate to pay all accrued or accumulated benefits, any loss was to plan surplus. Because Participants have no claim or entitlement to Plan surplus, "the reality is that a relatively modest loss to Plan surplus is a loss only to 3M, the Plan's sponsor." Harley, 284 F.3d at 906. Participants failed to meet their burden of proving the absence of a substantial surplus under any relevant valuation method. Thus, we held that the Granite loss was a loss only to plan surplus, not to Participants, and Participants therefore had not suffered a cognizable harm. Allowing Participants to nonetheless sue under section 1132(a)(2) to recover on behalf of the plan would violate the constitutional standing requirement in Article III that a "plaintiff must have suffered an 'injury in fact.'" Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Moreover, granting Participants standing would also violate prudential considerations, since we determined that ERISA's primary purpose–the protection of individual pension rights–would not be furthered by allowing Participants to pursue these claims. Id. at 907.

Participants allege that approximately two weeks before this Court issued its March 26, 2002, opinion, 3M began to publicly disclose information that the Plan was underfunded and had been underfunded since at least September 30, 2001. On March 11, 2002, 3M filed an SEC Form 10-K report. According to the Participants, the

report indicated that as of September 30, 2001 (the date for measuring Plan funding for SEC reporting purposes), utilizing optimistic assumptions, the Plan appeared to be underfunded by $300 million. Participants sought rehearing and rehearing en banc of the panel's opinion, and they included the allegation of underfunding in their petition. This Court denied rehearing.

Participants moved in the district court for relief from judgment in both related cases pursuant to Fed. R. Civ. P. 60(b), arguing that the judgment and this Court's decision had been predicated on 3M's misrepresentations that the Plan was overfunded. According to Participants, 3M misrepresented the level of Plan funding while the appeal was pending before this Court and only admitted a lack of surplus when Participants' appellate rights were exhausted. The district court denied the motions, and they have been consolidated for appeal.

I.

Participants moved for relief from judgment under Rule 60(b) of the Federal Rules of Civil Procedure. The rule allows district courts to vacate a judgment that was secured through a party's misrepresentations, among other things, and for "any other reason justifying relief." Fed. R. Civ. P. 60(b)(3), (6). Rule 60(b) "provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances." Atkinson v. Prudential Property Co., Inc., 43 F.3d 367, 371 (8th Cir. 1994) (quoting United States v. Young, 806 F.2d 805, 806 (8th Cir. 1986) (per curiam)). The district court's decision to deny a Rule 60(b) motion will be reversed only for an abuse of discretion. MIF Realty L.P. v. Rochester Assocs., 92 F.3d 752, 755 (8th Cir. 1996). Rule 60(b) is a motion grounded in equity and exists "to prevent the judgment from becoming a vehicle of injustice." Id. (citation omitted). "The rule attempts to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice should be done."

11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2851, at 227 (2d ed. 1995).

## II.

Participants argue that 3M misrepresented the level of Plan funding several times throughout the litigation.  To prevail on a Rule 60(b)(3) motion, Participants must show, "with clear and convincing evidence, that the opposing party engaged in a fraud or misrepresentation that prevented the movant from fully and fairly presenting its case."  Atkinson, 43 F.3d at 372-73.

Participants argue that 3M misrepresented Plan funding in its brief filed with this Court on August 7, 2000.  3M asserted: "Today, and at all times since Granite's collapse, the Plan's assets have exceeded its liabilities (that is, the present value of the participants' accrued benefits). . . . [T]he Plan has surplus assets of over $2.2 billion."  3M made similar assertions in its oral argument to this Court on March 12, 2001.  Counsel argued, "The money is there.  The plan is still in a surplus position. . . . This is a grossly over-funded Plan. . . . The plan didn't suffer a loss here because all the money that's necessary to pay the beneficiaries is still there."  The Participants have not demonstrated that these were misrepresentations, as both were made before September 2001, the date on which the Plan became underfunded according to 3M's 10-K report.  Participants have produced no evidence that indicates 3M had any knowledge of this alleged underfunding before September 2001.

After September 2001, 3M was called upon to address the underfunding problem in its response to Participants' petition for rehearing and rehearing en banc. On March 11, 2002, two weeks before this Court issued its opinion in the underlying case, 3M filed its 10-K report with the SEC.  Participants noted the report in a footnote in their petition for rehearing.  3M likewise responded in a footnote by criticizing the Participants for citing to "a recent SEC filing by 3M" as an

inappropriate attempt to go outside the summary judgment record. 3M also called the information irrelevant because different valuation methods were used for the SEC filing and for ERISA purposes. We see no reason why these statements should be considered misrepresentations.[2] Participants have not presented the kind of clear and convincing evidence of misrepresentation necessary to prevail on a Rule 60(b)(3) motion.

III.

The Participants also argue that they are entitled to relief under Rule 60(b)(6). Relief is available under Rule 60(b)(6) only where exceptional circumstances have denied the moving party a full and fair opportunity to litigate his claim and have prevented the moving party from receiving adequate redress. <u>Atkinson</u>, 43 F.3d at 373.

Participants argue that the Plan is now so underfunded that justice will not be served unless we revisit the standing analysis in our first opinion. We held that Participants suffered no injury in fact because the challenged investment caused a loss in Plan surplus only. Without injury, they lacked standing to bring an action. We further held that, in order to demonstrate standing, the Participants had an affirmative burden to prove that the Plan did not have an adequate surplus. Participants claim that 3M's 2002 10-K report shows at least a $300 million deficit since September 2001, and 3M's 2003 IRS filing shows a $1.5 billion deficit since January 2002. They argue that our first decision was fact-specific. If we had known the Plan was not in

---

[2] Participants also claim that certain statements 3M made about Plan surplus in response to Participants' petition for rehearing were misrepresentations. We believe it is clear from the context of the statements that 3M was referring to Plan funding as it was litigated in the district court. In addition, any statements 3M made about Plan funding to the press or its investors in 2002 and 2003 are not relevant for the purposes of this appeal.

fact a "robust, richly funded, ongoing plan," we would not have denied Participants standing to recover for 3M's alleged fiduciary breaches.

The district court did not abuse its discretion in denying Participants' Rule 60(b) motion. The district court denied Participants' motion because Participants' claims do not alter the standing analysis as stated in this Court's first decision. The funding levels in the SEC and IRS filings resulted from different valuation methods, and Participants advance no convincing arguments as to why these valuation measures are relevant. More importantly, "[b]ecause standing is determined as of the lawsuit's commencement, we consider the facts as they existed at that time." Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000). Participants filed their amended complaint in this case on November 27, 1996. The district court determined that the Plan's funding status had a surplus under the appropriate level during every year from 1994 to 2000. We recognize that, if market conditions had been different when Participants brought suit, or if a different valuation method had been used, they might have met their burden of proof for standing. However, the first indication that this may no longer be a well-funded Plan was not until nearly five years after Participants filed suit, when 3M's 10-K raised the specter that the Plan had been underfunded since September 2001. The policy in favor of finality weighs too heavily here to grant Participants' Rule 60(b) motion.

This case does not present the exceptional circumstances which make the extraordinary relief of Rule 60(b) appropriate. We affirm the judgment of the district court.

BYE, Circuit Judge, concurring.

The district court correctly concluded standing depends on the facts as they exist when a lawsuit is commenced. This Court concluded in the first appeal the plan participants lack standing because there was no loss to the plan when this action was filed in June 1996. See Harley v. Minn. Mining & Mfg. Co., 284 F.3d 901, 904, 906-

08 (8th Cir. 2002) (<u>Harley I</u>). Thus, I agree the district court did not abuse its discretion in denying the plan participants' motion for relief under Federal Rule of Civil Procedure 60(b). Although I am bound by the Court's conclusion the plan participants lacked standing when this lawsuit was commenced, I write separately to express again my disagreement with the standing analysis in the first appeal. <u>See</u> <u>id.</u> at 909-10 (Bye, J., concurring in part and dissenting in part).

Under the approach adopted in <u>Harley I</u>, a plan participant's standing to bring suit under 29 U.S.C. § 1132(a)(2) on behalf of a defined benefit plan may depend on nothing more than how the stock market is performing. When the market is doing well – as it was in the late 1990s – a defined benefit plan is more likely to have a surplus, and thus a plan participant will lack standing to bring a lawsuit on behalf of the plan. When the market is performing poorly, plan participants are more likely to have standing to recoup a loss to a defined benefit plan because the plan is more likely to be underfunded.

I do not see the sense in tying a plan participant's standing under § 1132(a) to the stock market's performance. A defined plan's ability to recover losses caused by a fiduciary's breach should not depend upon the vagaries of the stock market. Under <u>Harley I</u>, plan fiduciaries are partially insulated from liability during times when the market is good. But in the long run – as this case demonstrates – the loss will still affect plan participants when the market is down. Thus, I still believe a suit by plan participants under § 1132(a)(2) should be recognized for what it is – an action by the plan itself, but brought by plan participants "*in a representative capacity* to remedy an injury to the Plan itself." <u>Harley I</u>, 284 F.3d at 910 (Bye, J., dissenting). The question of standing for bringing such a suit should be tied to whether the plan had a loss, period, not whether the plan participants arguably suffered a loss at any particular snapshot in time, based on fluctuations in the stock market.

_____