10-1862-cv
Milgram v. Orthopedic Associates et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: September 12, 2011    Decided: November 29, 2011)
Amended: December 23, 2011

Docket Nos. 10-1862-cv (L), 10-1893 (CON)[*]

ROBERT W. MILGRAM, M.D.,

*Plaintiff-Appellee,*

— v.—

THE ORTHOPEDIC ASSOCIATES DEFINED CONTRIBUTION PENSION PLAN,

*Defendant-Appellant,*

— v.—

ORTHOPEDIC ASSOCIATES OF 65 PENNSYLVANIA AVENUE, BINGHAMTON, NEW YORK, P.C., as plan administrator of the Orthopedic Associates Defined Contribution Pension Plan; MICHAEL MCCLURE, M.D.; CHARLES W. CARPENTER, M.D.; KAMLESH S. DESAI, M.D.; LAURENCE U. SCHENK, M.D.; DOUGLASS R. KERR, M.D.; ROBERT M. SEDOR, JR., CFP, RCF, Upstate Management Associates, Inc., D/B/A The Bay Ridge Group; NORAH A. BREEN.

*Defendants.*

B e f o r e:
CALABRESI, WESLEY, and LYNCH, *Circuit Judges*.

---

[*] The consolidated case was withdrawn by stipulation filed July 22, 2011.

Plaintiff-appellee Robert Milgram filed suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)-(3), seeking to recover funds that were erroneously removed from his pension fund account and credited to that of his former wife, Norah Breen.  Following a bench trial, the United States District Court for the Northern District of New York (Gary L. Sharpe, *Judge*) entered judgment against defendant The Orthopedic Associates Defined Contribution Pension Plan ("the Plan") in the amount of $1,571,723.73, which included the principal amount, accumulated earnings and pre-judgment interest.  On appeal, the Plan argues that enforcement of the judgment is prohibited by the terms of the pension agreement, ERISA's anti-alienation provision, ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1), and other provisions of federal and state law. The Plan also argues that the district court's award of accumulated earnings is inconsistent with our decision in Dobson v. Hartford Financial Services Group, Inc., 389 F.3d 386 (2d Cir. 2004).  Finding these arguments to be without merit, we AFFIRM the judgment of the district court.

———————

> CARTER H. STRICKLAND, Mackenzie Hughes LLP, Syracuse, New York, *for Plaintiff-Appellee*.
>
> JAMES E. HUGHES, Hancock & Estabrook LLP, Syracuse, New York, *for Defendant-Appellant*.

———————

GERARD E. LYNCH, *Circuit Judge*:

This appeal requires us to consider what limitations, if any, the Employee

Retirement Income Security Act ("ERISA") imposes on the enforceability of a judgment rendered against pension plan assets under Section 502(a)(1) of that statute, 29 U.S.C. § 1132(a)(1).  Plaintiff Robert Milgram seeks to recover approximately $1.5 million in pension assets and accrued earnings and interest from The Orthopedic Associates Defined Contribution Pension Plan ("the Plan"), which in 1996 erroneously transferred half the balance of Milgram's pension account to his ex-wife, Norah Breen.  Following a bench trial in 2006, the United States District Court for the Northern District of New York (Gary L. Sharpe, *Judge*) granted Milgram judgment against the Plan in that amount and granted the Plan an equivalent judgment against Breen.  The Plan now challenges the enforceability of the judgment against it on the ground that requiring its payment before the Plan has fully recovered from Breen would violate ERISA's anti-alienation provision, ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1), as well as other provisions of federal and state law.  The Plan also argues that the district court erred in interpreting the plan document to afford compensation to Milgram for the lost use of his funds during the fifteen year period since the erroneous distribution.

As the majority of the Plan's claims assert legal errors in the district court's judgment, unless otherwise noted our standard of review is de novo.  See Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009).  Applying the appropriate standards of review, we find the Plan's arguments to be without merit.  Accordingly, we affirm the judgment of the district court.

# BACKGROUND

Until he retired from the practice of medicine in 1991, Milgram worked as an orthopedic surgeon affiliated with the medical group Orthopedic Associates of 65 Pennsylvania Avenue, Binghamton, New York, P.C. ("Orthopedic"). By virtue of his membership in the group, Milgram became the beneficiary of two separate ERISA-governed pension plans. One was a defined contribution plan, the proceeds of which are at issue in this litigation ("the Plan" or "the MPP"); the other was a profit-sharing plan ("the PSP"). Under both plans, Orthopedic itself was formally designated as plan administrator. In practice, however, Orthopedic employed an outside entity on a contract basis to provide day-to-day administrative services. During the period relevant to this lawsuit, those services were provided by the Bay Ridge Group, which was headed by Robert Sedor.

In 1996 Milgram and his wife, Norah Breen, divorced. Their divorce settlement entitled Breen to half the balance in Milgram's PSP fund (a share valued at $326,082 at the time of the settlement) and a fixed sum of $47,358 from Milgram's MPP account plus accumulated earnings. Due to a clerical error, however, Bay Ridge transferred half of *both* accounts to a separate account created in Breen's name. This resulted in Breen's receiving $763,847.93 more than she was entitled to receive under the settlement.

Milgram did not discover the error immediately. Shortly after the accounts were segregated, he terminated his membership in the plans and rolled the remaining balances over to an Individual Retirement Account. Breen withdrew the balance of her account in

4

September 1998. It was only in June of 1999 that Milgram, at his lawyer's insistence, reviewed his plan account statements and discovered the overpayment to Breen. By that time, none of the erroneously transferred funds remained in the Plan. In October 1999 Orthopedic, acting as plan administrator, demanded that Breen give back the excess distribution. When she refused, Orthopedic sued Bay Ridge, Sedor, and Breen to recoup the overpayment. Two years of litigation failed to result in a settlement or a dispositive ruling by the district court. As a result, Milgram, who still had not recovered his money, sued Orthopedic, the Plan, the trustees, Sedor, Bay Ridge, and Breen asserting both contract and fiduciary duty claims under ERISA § 502(a)(1)-(3), 29 U.S.C. § 1132(a)(1)-(3).

The district court consolidated the two cases and discovery proceeded for several years thereafter. In October of 2005, Milgram moved for partial summary judgment against Orthopedic and the Plan, relying on a theory of contractual liability under ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1). He sought a judgment for both the principal amount that was erroneously transferred to Breen and for accumulated earnings. The Plan opposed the motion, arguing, as relevant here, that the requested relief would be inconsistent with the policies of ERISA, because an award against the Plan before it had recovered from Breen would impair the interests of other Plan members. While Milgram's motion for summary judgment against the Plan was pending, Orthopedic moved for summary judgment against Breen.

In March 2006, soon after both motions were fully briefed, the district court announced that it would postpone decision and instead hold a bench trial on Milgram's equitable claims. On the first day of trial, however, the judge announced that he would grant Milgram's motion for partial summary judgment against the Plan in the principal amount. Though no summary judgment order had yet been entered, Milgram relinquished his equitable claims against the other defendants, believing, with good reason, that he had prevailed on his contract claim.[1] After these actions, the only issues remaining for trial were Breen's equitable defenses; whether Sedor was a fiduciary such that he could be held liable to the Plan and/or Orthopedic; and whether Milgram was entitled to accumulated earnings and interest on the principal amount of the judgment.

The trial took place over several days in the summer of 2006. Shortly after it concluded, the district court executed an order – the text of which was prepared jointly by attorneys for Milgram and Orthopedic – granting Milgram summary judgment against the Plan in the principal amount that was erroneously transferred to Breen ($763,847.93). The court reserved decision as to whether Milgram was also entitled to accumulated earnings and interest. In December 2006, Milgram moved to enforce the $763,847.93 judgment. The Plan opposed the motion, for the first time arguing that payment of the

---

[1] In addition, as the district court noted during post-trial proceedings, there was also some question at the time as to whether ERISA permits an individual plan member to bring a breach of fiduciary duty claim against the administrator of a defined contribution plan. The Supreme Court subsequently made clear that such claims are permissible. See LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 256 (2008)

judgment would violate a specific ERISA provision – the statute's prohibition on alienation of pension plan benefits. See ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1).

The district court did not act on the motion until March 2010, at which time it issued the written opinion that is the subject of this appeal. The district court held that Milgram was entitled to recover accumulated earnings and interest, as well as the principal amount of his loss. It also recognized that its 2006 award of partial summary judgment in favor of Milgram had been unenforceable because it had not been certified as final pursuant to Federal Rule of Civil Procedure 54(b). Accordingly, the court vacated the earlier award and entered a new judgment against the Plan in the amount of $1,571,723.73 – the $763,847.93 principal sum, plus accumulated earnings and interest on that amount. The court rejected the Plan's argument that ERISA's anti-alienation rule precluded enforcement of this judgment. Addressing the other issues that had been left unresolved following the 2006 trial, the court found that Sedor and Bay Ridge had no fiduciary duty to the Plan or its participants and therefore dismissed all ERISA claims against them. Finally, the district court ordered Breen to make restitution to the Plan in the same amount that it awarded Milgram ($1,571,723.73). Breen was directed to make the payment within thirty days or risk having a constructive trust placed on any funds in her possession that could be traced to the erroneous transfer.

The Plan subsequently moved to prohibit enforcement of the district court's award in favor of Milgram, reasserting its claim that requiring payment of the award before the Plan recovered from Breen would violate ERISA's anti-alienation provisions. The Plan

7

also argued, apparently for the first time, that it was entitled to relief from the judgement under N.Y. C.P.L.R. 5239 and 5240 and Federal Rule of Civil Procedure 60(b)(6). Milgram opposed the motion and cross-moved for the court to reinstate the equitable claims he had released on the eve of the 2006 bench trial. The district court rejected both motions and issued a writ of execution against the Plan in August 2010. The Plan appeals both from that order and from the district court's March 2010 decision.

## DISCUSSION

I.  Plan Liability and ERISA's Anti-Alienation Provision

ERISA provides that "[a]n employee benefit plan may sue or be sued under this subchapter as an entity" and that any resulting money judgment "shall be enforceable only against the plan." ERISA § 502(d)(1)-(2), 29 U.S.C. § 1132(d)(1)-(2). The Supreme Court has recognized that this language "clearly contemplates the enforcement of money judgments against benefit plans." Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 832 (1988). Although Mackey concerned a welfare benefit plan rather than a defined contribution pension plan like the one at issue in this case, the plain language of Section 502 does not distinguish between types of ERISA-governed plans. The text of the statute thus appears to make clear that ERISA permits Milgram both to sue the Plan for its misapplication of his funds and to seek enforcement of the resulting award against plan assets.

Nonetheless, the Plan asks us to read an exception into the unqualified language of Section 502. Although implicitly acknowledging that the "sue or be sued" language

8

applies on its face to all ERISA-governed plans, the Plan argues that distinctions between types of plans that are drawn in *other* sections of the statute operate to constrain the remedial authority of the district court in proceedings under Section 502.

The starting point for this argument is ERISA's so-called anti-alienation provision, which applies only to pension plans. ERISA § 206(d)(1) mandates that a pension plan governed by the statute "shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). The Internal Revenue Code likewise conditions preferential tax treatment on a pension plan's prohibiting alienation and assignment of participant benefits. See 26 U.S.C. § 401(a)(13)(A). In conformity with these requirements, Section 9.3 of the plan at issue here provides:

> Subject to the exceptions provided below, no benefit which shall be payable to any person (including a Participant or his Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge . . . .

The Plan argues that, although Mackey's unqualified assertion that money judgments may be enforced against plan assets may have been a correct statement of the law with regard to welfare benefit plans, when the plan being sued is a pension plan, limitations like those in Section 9.3 and the provisions of federal law that mandate their inclusion in the document require a more nuanced approach.

The Plan does not dispute that under certain circumstances a defined contribution pension plan may be subject to a money judgment under Section 502. Rather it argues that, in this particular case, the district court erred by requiring the Plan to make good on

9

its debt to Milgram before it had recovered the equivalent funds from Breen. That is because, in the Plan's view, all of the assets currently held in the Plan constitute "benefits" allocated to Plan participants other than Milgram or Breen. Therefore, the Plan argues, the anti-alienation provisions of ERISA, the IRC, and the plan document prohibit those funds from being used to satisfy the district court's judgment. We disagree both because undistributed funds held in trust for the members of a defined contribution pension plan do not constitute "benefits" within the meaning of the anti-alienation provisions, and because the anti-alienation rule does not prevent pension plan assets from being used to satisfy a judicial judgment that has been entered against the plan itself.

As to the first point, the Plan takes its definition of "benefits" from Section 6.1 of the plan document, which provides that, upon retirement, a plan participant is entitled to collect "all amounts credited to such Participant's Combined Account." Elsewhere, the Participant's Combined Account is defined as "the account established and maintained by the Administrator for each Participant with respect to his total interest under the Plan resulting from the Employer's contributions." See Plan Document § 1.48. Reading these provisions together, the Plan maintains that a participant's inalienable "benefit" consists of all assets held by the Plan that are attributed at any point to that participant, whether or not the participant is currently entitled to collect them.

But the Plan's argument proves too much. If it were true that, once credited to a particular participant's account, Plan funds become "benefits" whose alienation and assignment is prohibited by ERISA, then the plan administrator would be prohibited from

10

debiting participants' accounts even to cover expenses that ERISA and the Plan specifically contemplate they will bear. For example, in years in which the trust corpus suffers an investment loss, Section 4.3(c) of the plan document requires the administrator to debit each participant's account "in the same proportion that each Participant's and Former Participant's nonsegregated accounts bear to the total of all Participants' and Former Participants' nonsegregated accounts." Similarly, Section 4.3(d) provides that "Participants' Accounts shall be debited for any insurance or annuity premiums paid," and ERISA § 404(a)(1)(A)(ii) authorizes the plan administrator to use pension assets to "defray[ ] reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii); Pension and Welfare Benefits Admin., Advisory Opinion 97-03A (Jan. 23, 1997).

Moreover, the Plan's reading of the plan document is highly selective. Section 6.1, from which the Plan draws its definition of "benefits," is entitled "Determination of Benefits *Upon Retirement*" and clearly states that the relevant calculations are to be performed "[u]pon [the plan participant's] Normal Retirement Date or Early Retirement Date." Plan assets therefore become "benefits" only when they are finally distributed to the participant at the time of retirement. Indeed, prior to that point, a participant cannot truly be said to have a claim to any particular assets in the trust corpus. "A defined contribution plan is not merely a collection of unrelated accounts." La Rue, 552 U.S. at 262 (Thomas, J. concurring). Rather, all of the Plan's undistributed assets are legally owned by the trustee and managed for the benefit of all plan participants, with gains and losses shared by them on a pro rata basis. A single participant's "account" is merely a

11

bookkeeping entry that is used at the time of his retirement to determine what benefits he is entitled to receive. See id.; see also O'Toole v. Arlington Trust Co., 681 F.2d 94, 96 (1st Cir. 1982) (distinguishing between trust corpus and "benefits" to conclude that ERISA's anti-alienation provision does not prevent a creditor of the plan from garnishing pension trust funds).

In this regard, it is significant that each of the cases that the Plan cites to support its anti-alienation argument concerns an effort to levy against pension income already being received by plan members. Thus, in Guidry v. Sheet Metal Workers National Pension Fund, 493 U.S. 365 (1990), the Supreme Court cited ERISA's anti-alienation provision in refusing to allow a union that Guidry had defrauded to satisfy its judgment against him by garnishing current pension income. And, in Kickham Hanley P.C. v. Kodak Retirement Income Plan, this Court refused, on anti-alienation grounds, to permit the withholding of attorney's fees from pension plan benefit payments to which the "plan participants [were] presently entitled." 558 F.3d 204, 214 (2d Cir. 2009).

Nor do these cases support the Plan's claim that if undistributed account funds *could* be considered "benefits," their use to satisfy a court-ordered judgment against the Plan would be prohibited. Both Guidry and Kickham Hanley concerned a creditor's efforts to levy on pension assets to satisfy obligations that had allegedly been incurred – directly or indirectly – *by pensioners themselves*. Neither case stands for the proposition that ERISA's anti-alienation provision would prevent the attachment of pension assets in order to satisfy the debts *of the plan*. Indeed, the structure of the statute strongly suggests

12

a distinction between using plan assets to satisfy the debts of the plan and using plan assets to satisfy debts of plan participants. ERISA § 206(d) outlines several carefully circumscribed exceptions to its general prohibition on the alienation or assignment of pension benefits. *See* 29 U.S.C. § 1056(d). Each of these exceptions addresses restrictions that the anti-alienation provision places on *pension beneficiaries*; no mention is made of similar restraints on plan administrators. Cf. O'Toole, 681 F.2d at 96 (making a similar point). Treasury Department regulations that interpret the corresponding provisions of the Internal Revenue Code tell a similar story. See 26 C.F.R. § 1.401(a)-13(c).[2] In short, we find no authority – statutory or decisional – to support the argument that ERISA's prohibition on alienation impairs a plan's ability to pay *its own* debts.[3]

---

[2] The regulations interpret IRC § 401(a)(13)'s prohibition on assignment and alienation of plan benefits to include "[a]ny arrangement providing for the payment *to the employer* of plan benefits which otherwise would be due the participant under the plan," and "[a]ny direct or indirect arrangement . . . whereby a party acquires *from a participant or beneficiary* a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment." 26 C.F.R. §§ 1.401(a)-13(c)(i)-(ii) (emphasis added). Like ERISA § 206, both scenarios seem to contemplate attempts at assignment by plan beneficiaries. Certainly, neither definition encompasses the Plan's payment of a judgment that has been rendered against it as an entity.

[3] Subsequent to the original publication of this opinion, the Plan filed a petition for rehearing in which it cited, for the first time, three out-of-circuit cases that the plan argues are inconsistent with the holding we reach here. See Graden v. Conexant Systems Inc., 496 F.3d 291, 296-303 (3rd Cir. 2007); Evans v. Akers, 534 F.3d 65, 71-75 (1st Cir. 2008); Harris v Amgen, 573 F.3d 728, 734-737 (9th Cir. 2009). The relevant passage, which actually appears in only two of the cases, is pure dictum.

In Graden, a former participant in a defined contribution pension plan sued the plan administrator for allegedly mismanaging plan assets and thus reducing the benefits that the plaintiff had received. The plan administrator argued that the plaintiff lacked statutory standing to bring a fiduciary duty action under ERISA § 502(a)(2), because he was not a "former employee . . . who is or may become eligible to receive a benefit." See 29 U.S.C.

The Plan argues, however, that the absence of authority in support of its position

should not end our inquiry. It notes that the alienation issue it identifies is particular to

defined contribution pension plans, which, until relatively recently, were far less popular

(and therefore far less likely to be the subject of litigation) than defined benefit plans.

See LaRue, 552 U.S. at 255; see also Edward A. Zelinsky, The Defined Contribution

Paradigm, 114 Yale L.J. 451, 471 (2004) (discussing the "significant reversal of historic

patterns under which the traditional defined benefit plan was the dominant paradigm for

the provision of retirement income"). The Plan maintains that a close examination of the

distinctions between defined contribution and defined benefit plans compels the

---

§§ 1132(a)(2), 1109. The Third Circuit rejected this argument, noting that if the plaintiff
were successful in proving a breach of fiduciary duty, he would be entitled to the additional
funds that, absent the mismanagement, would have been in his account at the time he cashed
out of the plan. The court further observed that it was likely that the plaintiff also had a
contract claim under Section 502(a)(1)(B). It speculated, however, that he might have
chosen not to bring such a claim, because

> [i]n individual account plans, all of the plan's money is allocable
> to plan participants. 29 U.S.C. § 1002(34). Using a [§
> 502(a)(1)(B)] suit to force the plan to use money already
> allocated to others' accounts to make good on [plaintiff's] loss
> would present a host of difficulties with which few sensible
> plaintiffs would want to contend. Indeed, it *may be* that
> ERISA's fiduciary obligations prevent plans from paying
> judgments out of funds allocable to other participants, in which
> case the plan, though liable, would be judgment proof.

Graden, 496 F.3d at 301 (emphasis added). Faced with similar standing disputes, the First
Circuit in Evans followed the reasoning of Graden and quoted the above discussion, 534 F.3d
at 72-73, and the Ninth Circuit in Harris adopted the standing analysis without quoting or
endorsing that passage, 573 F.3d at 734-737.

The passages on which the Plan relies amount to dictum, of the most passing and
speculative nature. For the reasons stated at length in this opinion, we do not find them
persuasive.

14

conclusion that enforcement of a judgment against the former poses anti-alienation problems that enforcement against the latter does not. It suggests that our failure to recognize those dangers in previous cases is not because they do not exist, but because the historical dominance of defined benefit plans has prevented the issue from being litigated previously. The argument is unpersuasive.

The Plan is correct that the two types of pension plans differ in important respects. Defined benefit plans promise participants a specified, periodic benefit at retirement. Although the investment pool from which those benefits are drawn may be funded in various ways, the employer typically bears the risk associated with operating the plan and must cover any shortfall. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439 (1999). In contrast, in a defined contribution plan, the employer contributes a fixed sum on a periodic basis. The employee's benefits on retirement are a function of the contributions – his own and those of his employer – that have been credited to his account, "and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." ERISA § 3(34); 29 U.S.C. § 1002(34). "Under such plans, by definition, there can never be an insufficiency of funds in the plan to cover promised benefits, since each beneficiary is entitled to whatever assets are dedicated to his individual account." Hughes, 525 U.S. at 439 (internal citation, quotation marks and brackets omitted).

A consequence of these distinctions is that, whereas satisfaction of a judgment from the corpus of a defined benefit plan may not affect individual participant benefits,[4] in the case of a defined contribution plan, it will almost certainly do so, since the employer is under no ongoing obligation to fund the plan to maintain benefits at a set level. The Plan argues that imposing these costs on pension beneficiaries undercuts ERISA's policy goals and violates the anti-alienation provision. Yet it is the distinctive feature of defined contribution plans that they require the employee rather than the employer to bear the pension risks associated with investment instability, underfunding, beneficiary longevity and, indeed, litigation. See Zelinsky, supra, at 458-69. By design, participants in a defined contribution plan bear the risk that the value of their accounts will be reduced as a result of actions taken by the plan administrator; just as the anti-alienation provision does not protect participants against poor investment decisions by the plan administrator,[5] it does not protect them against the risk that poor management decisions will expose the plan's assets to liability.

Contrary to the Plan's suggestion, then, the relative novelty of defined contribution plans does not explain our failure heretofore to recognize limits on the litigation risk that participants in such a plan can be required to bear on the plan's behalf. Rather, it is the

---

[4] Of course, a substantial judgment against a defined benefit plan that is already in financial straits may well tip the plan into insolvency.

[5] Some plans allow the plan participant to control her individual exposure to risk by choosing particular investments or classes of investments to which the earnings of her pension account will be tied. Plans structured in such a fashion only make it more clear that the employee rather than the fund manager bears the risk of investment decisions.

16

fact that defined contribution plans eschew any such limitation that is, at least in part, responsible for their increasing prevalence. See id.

## II. The Plan's Other Arguments Against Enforceability

In its attempt to avoid enforcement of the district court's judgment, the Plan also relies on several other provisions of the plan document, ERISA, and New York State law that, it argues, prohibit Milgram from recovering from the Plan before the Plan has recouped the funds that it erroneously disbursed to Breen. These arguments are no more persuasive than the Plan's anti-alienation argument.

For example, Section 9.7 of the plan document reads, "Except as provided below and otherwise specifically permitted by law, it shall be impossible . . . for any part of the corpus or income . . . to be used for, or diverted to, purposes other than the exclusive benefit of Participants, Retired Participants, or their Beneficiaries." The Plan suggests that the use of plan funds to compensate Milgram for the Plan's misapplication of funds from his account would contravene this provision. That argument, however, ignores both the fact that Milgram himself is a "Retired Participant" and that, under ERISA § 502(d), the enforcement of a money judgment against plan assets is "specifically permitted by law." See Mackey, 486 U.S. at 832.

The Plan further objects that to permit enforcement of the judgment would require Orthopedic, as plan administrator, to violate its fiduciary duties under the statute. ERISA § 404 requires the plan administrator to discharge its duties "solely in the interest of the participants and beneficiaries," but it defines "defraying reasonable expenses of

17

administering the plan" to be a purpose consistent with that duty. See ERISA § 404(a)(1)(A)(ii), 29 U.S.C. § 1104(a)(1)(A)(ii). Although the Plan maintains that the cost of compensating Milgram does not constitute a "reasonable expense" within the meaning of the statute, the authority that it cites, an advisory opinion published by the Pension and Welfare Benefits Administration, see Advisory Opinion 97-03A (Jan. 23, 1997), addresses a situation entirely different from the one that we confront here. To the extent that the opinion is relevant to this case as all, its assertion that "as a general rule, reasonable expenses of administering a plan include direct expenses properly and actually incurred in the performance of a fiduciary's duties to the plan," cuts against the Plan's argument. We have little trouble concluding that the payment of a judicial judgment that the Plan is required by law to satisfy, in favor of a plan beneficiary whose rights have been violated by the Plan, is an expense that the administrator would "properly and actually incur[]" in the performance of its duties. Indeed, it could well be argued that it is the *failure* to pay Milgram the money to which he is entitled as a plan participant that would violate the administrator's fiduciary duties.

This conclusion also answers the Plan's claim that withdrawing plan assets to pay the judgment would constitute a prohibited transaction under ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). That section prohibits an ERISA fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." The Plan argues that if Orthopedic were to use plan assets to satisfy the judgment it would be acting in its "own interest," since Milgram also had a claim against Orthopedic for its misconduct as plan

18

administrator.  But, as we noted above, the Plan is under a legal duty to reimburse Milgram.  Orthopedic's payment of the judgment is therefore a ministerial function, not a discretionary one to which fiduciary liability might attach.  See Harris Trust and Sav. Bank. v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 29 (2d Cir. 2002).

The Plan also maintains that permitting recovery against plan assets would run afoul of ERISA's directive that a "money judgment . . . against an employee benefit plan . . . shall not be enforceable against any other person unless liability against such person is established in his individual capacity."  ERISA § 502(d)(2), 29 U.S.C. § 1132(d)(2).  In the Plan's view, the district court's judgment is effectively a prohibited judgment against plan members, because it is their individual retirement accounts that will suffer.  While enforcement of the judgment may cause current plan participants to receive less generous pension benefits than they otherwise might have received, that does not change the fact that, as a matter of law, Milgram seeks enforcement against the plan rather than against any of the participants individually.  Moreover, because each participant's potential loss on a judgment against the Plan is capped at the balance of his individual account, suing the Plan is not the economic or legal equivalent to suing the participants directly.

Finally, the Plan argues that the district court erred in refusing to suspend enforcement of the judgment pursuant to either N.Y. C.P.L.R. 5239 and 5240 or Federal Rule of Civil Procedure 60(b)(6).  But C.P.L.R. 5239 and 5240 are state procedural rules; they provide no substantive rights and therefore have no relevance to this proceeding in

19

federal court. In contrast, Rule 60(b)(6) is a federal rule that permits the district court to relieve a party from a final judgment in the interests of justice. But the rule does not require the district court to withhold enforcement of the judgment; it merely confers discretion on the court, whose denial of relief under the rule may be overturned only if we conclude that that discretion was abused. See Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d Cir. 1998). We find no basis for reaching that conclusion in this case. Not only does ERISA specifically authorize the judgment at issue here, but also it seems likely that any harm done to the Plan or its participants will be mitigated significantly by the Plan's recovery of some or all of the funds from Breen. The district court, therefore, did not abuse its discretion in concluding that the enforcement of the judgment was consistent with the interests of justice.

In sum, we have considered all of the Plan's arguments, and find that none of them warrants reversal of the district court's judgment that the Plan must pay Milgram what he is due, whether or not it can succeed in recovering the funds that it, through no fault of Milgram's, erroneously paid to Breen.

III. Milgram's Entitlement to Accumulated Earnings and Prejudgment Interest

In addition to contesting the enforceability of the judgment as a whole, the Plan argues that the district court erred in awarding Milgram accumulated earnings and prejudgment interest on the $763,847.93 principal amount. The parties agree that under our decision in Dobson v. Hartford Financial Services Group, Inc., 389 F.3d 386 (2d Cir. 2004), Milgram's right to be compensated for the time value of the misdirected funds is a

20

question of contract interpretation to be decided under federal common law.

In concluding that accumulated earnings and prejudgment interest were available in this case, the district court noted that the plan document specifically recognizes the right of a beneficiary to recover accumulated earnings where a portion of his account has been segregated for some time pursuant to a Qualified Domestic Relations Order (QDRO) that is ultimately declared invalid. The existence of this provision, along with general fairness considerations, led the court to conclude that "implicit in the Plan's terms is the commonly held notion that there is a time value to the extended period that Milgram has been without money the Plan owed him." We agree.

The Plan argues that the district court's interpretation is unsustainable in light of the fact that, unlike the plan in Dobson, it has not had control over the missing funds during the period of delay and therefore has not able to profit from them. Yet the decision in Dobson did not turn on equitable considerations but rather on the express and implied terms of the plan document itself. In that regard, we noted that "[i]mplied agreements to pay interest on delayed disbursements of owed money fit squarely within [the] tradition of common law contract interpretation," 389 F.3d at 399, and quoted at length from a Supreme Court opinion suggesting that compensation for the time value of money in breach of contract actions is dictated by "natural justice, and the law of every civilized country," id., quoting Spalding v. Mason, 161 U.S. 375, 396 (1896).

The Plan also maintains that in awarding accumulated earnings and interest under a contract theory, the district court ignored the fact that Milgram contributed to the delay

21

by failing to examine his plan statements until several years after the erroneous distribution. Although this consideration might have supported discounting Milgram's recovery if he had been forced to bring his claim as one for "other equitable relief" under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), it is not relevant to his ability to recover in contract, which turns entirely on the express and implied terms of the plan document. As a matter of contract interpretation, the QDRO procedure relied upon by the district court evinces a clear orientation in the plan document towards compensating beneficiaries for the lost use of their funds – even when the loss may be partly of their own making.

The Plan's other arguments, which largely rehash those it made regarding its liability on the principal sum, are similarly unavailing. The interest and accumulated earnings that Plan must pay to Milgram are expenses, like the principal sum, that the Plan incurred due to its mismanagement of the trust fund. Plan members agreed to share such expenses as a condition of their participation in the fund. In any event, the fact that the Plan has a judgment against Breen, enforceable through a constructive trust, for the full amount that it must restore to Milgram gives us some confidence that no innocent party will suffer in the long run.

## CONCLUSION

We have considered all of the Plan's remaining arguments and find them to be without merit. Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.

22